## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| LOS CANGRIS, INC.; RAMON L. AYALA RODRIGUEZ, a/k/a "Raymond/Daddy Yankee/Big Boss/DY;" <br><br> Plaintiffs, <br><br> v. <br><br> RAFAEL A. PINA-NIEVES, a/k/a "Raphy Pina;" ANDRES A. COLL-FERNÁNDEZ; MIREDDYS GONZÁLEZ CASTELLANOS; EDWIN PRADO-GALARZA; LOS MAGNIFIKOS INC., d/b/a Los Magnifikos Music Publishing Inc., Los Magnifikos Music Publishing, and Los Magnifikos Music; WORLD MUSIC LATINO CORP., d/b/a Pina Records; PRENDI PUBLISHING TRUST, d/b/a Gasolina Publishing Co.; MAFER MUSIC PUBLISHING INC.; JOHN DOE; JANE DOE. <br><br> Defendants. | CIVIL NO. 25-01650 (GMM) <br><br><br> Nature of Claims: Racketeer Influenced and Corrupt Organizations Act; Puerto Rico Organized Crime Act; Permanent Injunctive Relief <br><br> Jury Trial Demanded |

## MOTION TO DISMISS THE COMPLAINT

**TO THE HONORABLE COURT:**

**COMES NOW** Defendant Mireddys González Castellanos ("González"), represented by the undersigned attorneys and, respectfully, states and prays:

### I.    INTRODUCTION

This civil RICO action is not a racketeering case. It is the latest chapter in the acrimonious and ongoing battle over the division of the conjugal legal partnership presently being litigated in the Puerto Rico state courts between Ramón L. Ayala Rodríguez and Mireddys González-Castellanos. Stripped of its rhetoric and criminal labels, the Complaint is a strategic maneuver in a domestic property dispute. In essence, it is an attempt to reframe contested ownership allocations

1

and publishing splits (author or composer share percentages) as "racketeering activity" in order to engineer leverage in the division of marital assets.

The timing, structure, and substance of the pleading make their purpose transparent. Plaintiffs seek to characterize long-documented publishing allocations that were memorialized in split sheets, confirmed in binding term sheets, incorporated into a multimillion-dollar catalog sale], and reflected in copyright registrations, as a decades-long criminal enterprise. Yet the relief sought is unmistakably economic and targeted. It seeks a reallocation of publishing percentages and royalty streams that would function as a de facto setoff against Mireddys González's participation in the conjugal partnership's assets. The RICO label is deployed not to remedy organized crime, but to achieve economic strangulation through treble damages, fee shifting, and reputational pressure.

As demonstrated in the sections that follow, the Complaint fails at every threshold required for a civil RICO claim. First, the transfers at issue satisfy the writing requirement of 17 U.S.C. § 204(a); without an invalid transfer, there is no unlawful deprivation of rights and therefore no predicate act. Second, the Complaint fails to plead a structurally distinct enterprise or a cognizable pattern of racketeering activity under *Boyle v. United States*, 556 U.S. 938 (2009), and *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12 (1st Cir. 2000). Third, the claims are time-barred under both RICO's four-year statute of limitations and the Copyright Act's three-year limitations period, given Plaintiffs documented knowledge of the challenged ownership splits no later than the 2019 catalogue transaction. Fourth, Plaintiffs fail to plead clear and definite injury to business or property as required by 18 U.S.C. § 1964(c), relying instead on speculative and conclusory allegations of diverted royalties. Finally, the action cannot proceed in the absence of indispensable co-authors and claimant entities whose ownership interests would be directly altered by the relief sought.

RICO was enacted to combat organized crime, not to weaponize federal litigation in aid of a matrimonial property dispute. The Supreme Court has cautioned against converting ordinary business conflicts into racketeering cases. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 500 (1985). The 16Circuit has likewise rejected efforts to recast commercial disagreements as patterns of racketeering. *Efron*, 223 F.3d at 20. This case presents precisely that impermissible expansion. Because the Complaint repackages a domestic ownership dispute as a federal racketeering enterprise, and because it fails to satisfy the statutory, structural, temporal, damages, and indispensable-party requirements governing civil RICO, dismissal under Rule 12(b) is warranted in its entirety.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

This action arises from a sprawling civil RICO Complaint filed on November 29, 2025, in the United States District Court for the District of Puerto Rico, captioned *Los Cangris, Inc., et al. v. Rafael A. Pina-Nieves, et al.*, Case No. 3:25-cv-01650 (D.P.R.), asserting claims under 18 U.S.C. §§ 1961–1964 and parallel Puerto Rico statutes. Plaintiffs allege that Defendants engaged in a long-running "fraudulent scheme" involving the purported misattribution of authorship and publishing interests in numerous musical compositions associated with Ramón L. Ayala Rodríguez (professionally known as Daddy Yankee) and Los Cangris, Inc.  Id.

According to the Complaint, the alleged scheme began "no later than 2015" and continued through 2025, primarily through email communications, the circulation and modification of split sheets, the submission of copyright registrations, and communications with performing rights organizations.   Plaintiffs characterize these acts as predicate offenses under 18 U.S.C. § 1343 (wire fraud), asserting that Defendants inserted Rafael A. Pina-Nieves' name as an author and/or claimant on various copyright registrations and publishing documents without legitimate creative contribution.  Id.

The Complaint itemizes dozens of alleged "predicate acts," organized by musical work and date.  For example, Plaintiffs allege that on or about November 28, 2005, copyright registrations were filed for *Intro – Implantando el 99*, *Caminando Contra el Viento*, *Eddie Kaneca*, *A Puercos Como Tú*, and *Un Sábado Gangsta*, identifying Pina-Nieves as both co-author and copyright claimant.   Plaintiffs similarly allege that on November 29, 2005, registrations for *Eso Eso* and *Mundo Frío* listed Pina-Nieves as co-author and claimant.  Id.

With respect to later works, Plaintiffs allege that on April 27, 2015, an email concerning *Mayor Que Yo 3* represented that Pina-Nieves had been assigned a five percent publishing share; on January 11, 2017, an email to ASCAP concerning *Otra Cosa* represented a thirty percent publishing share; and on December 14, 2017, an email regarding *Todo Comienza en la Disco* reflected a seven-and-one-half percent publishing share.   Plaintiffs further allege that between February 13, 2018 and June 26, 2018, emails and related documents concerning *La Rompe Corazones*, *Bella y Sensual*, *Buena Vida*, *Zum Zum Zum*, and *Vuelve* reflected varying publishing percentages attributed to Pina-Nieves, including five, ten, and twenty percent shares.  Id.

The Complaint also identifies 29 specific copyright registrations as alleged predicate acts. Out of the 29 songs, 18 were transferred to MA Rights LLC as part of the BTSA.

Plaintiffs allege that these acts collectively form a "pattern of racketeering activity" extending over nearly two decades.  Id.  The Complaint further asserts that Plaintiffs purportedly discovered aspects of the alleged scheme after December 20, 2024, when Ayala-Rodríguez assumed management of Los Cangris and obtained access to certain email accounts.  Id.

Procedurally, after filing the Complaint (Doc. 1), Plaintiffs were ordered to file a RICO Case Statement, which was submitted at Docket No. 26 on January 23, 2026.   The RICO Statement elaborates on the alleged predicate acts but does not materially alter the underlying

theory: that disputes over authorship attribution and publishing percentages constitute wire fraud and racketeering under federal law.  Id. As set forth below, even accepting the foregoing factual allegations as true for purposes of Rule 12(b)(6), the Complaint fails to plausibly allege the essential elements of a civil RICO claim and instead repackages a decades-spanning contractual and copyright dispute as organized criminal conduct.

The allegations against González can be summarized as follows:

| | Section / Cause of Action | Allegation (Transcribed) | Citation |
|---|---|---|---|
| 1 | General Allegations, Parties | "González-Castellanos acted as the enterprise's administrative coordinator, repeatedly preparing and circulating split sheets and publishing allocations that falsely inflated Pina-Nieves' shares while reducing Plaintiffs' interests." | (Doc.  1  ¶ 11) |
| 2 | General Allegations, Parties | "By transmitting these fraudulent records through interstate commerce and deliberately excluding Ayala-Rodríguez from communications, she ensured the misappropriation remained concealed and appeared legitimate." | (Doc. 1 ¶ 11) |
| 3 | General Allegations, Parties | "Her role provided the administrative backbone of the schemes, embedding false allocations into business records and copyright documentation." | (Doc. 1 ¶ 11) |
| 4 | Corporate Control Allegations | Ayala allegedly "entrusted the day-to-day management of El Cartel's and Los Cangris' internal affairs to his then-wife, González-Castellanos," who served as President and Director. | (Doc. 1 ¶ 25) |
| 5 | Corporate Authority Allegations | Complaint alleges she "lacked any authority to assign ownership interests in the musical compositions to Pina-Nieves." | (Doc. 1 ¶ 25) |
| 6 | Fiduciary / Control Narrative | Plaintiffs claim concern escalated after an alleged attempt by González-Castellanos to transfer $100 million from corporate accounts into personal accounts. | (Doc. 1 ¶ 26) |
| 7 | Scheme Allegations | Pina allegedly acted "in concert with González-Castellanos and other defendants" to conceal manipulation of publishing information. | (Doc. 1 ¶ 36) |
| 8 | Overt Acts, Email | Feb. 13, 2018 email: González-Castellanos "confirmed that Pina-Nieves' publishing share for the songs 'La Rompe Corazones' and 'Bella y Sensual' came from Los Cangris' percentage," excluding Ayala. | (Doc. 1 ¶ 54) |
| 9 | Overt Acts, Email | June 12, 2018: she sent emails showing Pina held 10% publishing share in "Buena Vida." | (Doc. 1 ¶ 55) |

| | Section / Cause of Action | Allegation (Transcribed) | Citation |
|---|---|---|---|
| 10 | Overt Acts, Email | June 18, 2018: she sent email documenting Pina assigned 20% in "Zum Zum Zum," not copied to Ayala. | (Doc. 1 ¶ 56) |
| 11 | Overt Acts, Email | June 18, 2018: she confirmed Pina had 10% in "Vuelve." | (Doc. 1 ¶ 57) |
| 12 | Overt Acts, Email | June 26, 2018: she again confirmed Pina had 20% in "Zum Zum Zum." | (Doc. 1 ¶ 59) |
| 13 | Overt Acts, Email | Oct. 17, 2018: she confirmed Pina (via Mafer) had 5% in "Inolvidable (Remix)." | (Doc. 1 ¶ 66) |
| 14 | Overt Acts, Email | June 6, 2019: she confirmed Pina had 22.5% in "Te Lo Dije." | (Doc. 1 ¶ 71) |
| 15 | Overt Acts, Email | June 6, 2019: she confirmed Pina had 10% in "Si Supieras." | (Doc. 1 ¶ 72) |
| 16 | Overt Acts, Agreement | Aug. 10, 2020: she signed songwriter split for "Relación (Remix)" allocating 2% to Pina. | (Doc. 1 ¶ 80) |
| 17 | Overt Acts, Email | Jan. 27, 2022: she allocated 5% to Pina in "Súbele El Volumen." | (Doc. 1 ¶ 90) |
| 18 | Enterprise Allegations (RICO Count) | Plaintiffs allege González-Castellanos was a member of the association-in-fact enterprise engaged in wire fraud and extortion. | (Doc. 1 ¶¶ 107–108) |
| 19 | Injury Allegations | Plaintiffs claim Defendants' conduct caused "reduced publishing ownership, diverted royalties, and loss of control." | (Doc. 1 ¶ 44) |

## III. LEGAL STANDARD GOVERNING RULE 12(b)(6) MOTIONS IN THE FIRST CIRCUIT AND ITS APPLICATION TO RICO CLAIMS

### A. Rule 12(b)(6) Standard in the First Circuit

Federal Rule of Civil Procedure 12(b)(6) requires dismissal of a complaint that fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The First Circuit applies the plausibility framework articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), requiring that a complaint contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face. The First Circuit employs a two-step analytical approach. First, the Court must distinguish factual allegations, which

are accepted as true, from conclusory legal allegations, which are not entitled to a presumption of truth. *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012). Second, the Court must determine whether the well-pleaded factual allegations permit a reasonable inference of liability. *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013). Plausibility requires "something more than merely possible" and more than allegations "merely consistent with a defendant's liability." *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011).

The plausibility standard functions as a screening mechanism designed to weed out cases that do not warrant discovery or trial. *Atieh v. Riordan*, 727 F.3d 73, 76 (1st Cir. 2013). A plaintiff "must state a plausible claim before he can invoke a right to discovery."  While some latitude may be appropriate where critical information lies within a defendant's control, courts remain obligated to dismiss complaints resting on speculation or formulaic recitations of elements. *Menard v. CSX Transp., Inc.*, 698 F.3d 40, 44–45 (1st Cir. 2012). In assessing a Rule 12(b)(6) motion, courts generally confine their review to the complaint and documents incorporated therein, except for documents central to the claim whose authenticity is not disputed.

## B. Heightened Scrutiny in Civil RICO Cases

Although RICO claims are evaluated under the same Rule 12(b)(6) plausibility framework, the First Circuit has repeatedly emphasized the need for particular care in civil RICO cases. The court has characterized civil RICO as an "unusually potent weapon," cautioning that courts must guard against its abusive deployment. *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000). Because of the stigma and leverage associated with RICO allegations, courts are instructed to scrutinize such pleadings with rigor at the motion to dismiss stage. To state a claim under 18 U.S.C. § 1962(c), a plaintiff must plausibly allege: (1) conduct (2) of an enterprise

(3) through (4) a pattern of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). Each element must be supported by factual allegations sufficient to cross the line from conceivable to plausible. The "pattern" requirement demands both relatedness and continuity. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239–40 (1989). The First Circuit has held that continuity requires either closed-ended continuity (a series of related predicates extending over a substantial period of time) or open-ended continuity (past conduct that poses a threat of future repetition). *Efron*, 223 F.3d at 15–18. Conclusory assertions of a "long-running scheme" are insufficient absent factual allegations demonstrating continuity.

Moreover, when the alleged predicate acts sound in fraud, such as mail or wire fraud, Federal Rule of Civil Procedure 9(b) imposes a heightened pleading requirement. Plaintiffs must specify the time, place, and content of the alleged false representations, as well as the identity of the speaker and the manner in which the statements were fraudulent. *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 291 (1st Cir. 1987). Generalized accusations of fraud do not suffice.

Finally, civil RICO requires injury to business or property proximately caused by the alleged racketeering conduct. 18 U.S.C. § 1964(c); *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). Failure to plausibly plead concrete, non-speculative injury warrants dismissal.

## III.    COPYRIGHT LAW § 204 IS A THRESHOLD OWNERSHIP REQUIREMENT THAT DEFEATS THE RICO CLAIMS AS A MATTER OF LAW

### A.    Legal Standard: Section 204(a) Is a Statutory Gatekeeper to Any Copyright-Based Theory

Section 204(a) of the Copyright Act provides that a transfer of copyright ownership "is not valid unless an instrument of conveyance… is in writing and signed by the owner of the rights conveyed." 17 U.S.C. § 204(a). Courts uniformly hold that § 204(a) functions as a statute of frauds

and a gatekeeping provision governing ownership disputes before any infringement analysis may proceed. Playboy Enters., Inc. v. Dumas, 53 F.3d 549, 557–58 (2d Cir. 1995); Imperial Residential Design, Inc. v. Palms Dev. Grp., Inc., 70 F.3d 96, 99 (11th Cir. 1995). The dispositive inquiry under § 204(a) is whether a signed writing objectively manifests a present intent to transfer ownership; no particular formality or magic words are required so long as the writing reflects an intent to convey rights. Playboy, 53 F.3d at 557. Even a brief memorandum or informal agreement may satisfy § 204(a) if it evidences the transfer and is signed by the transferor. Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 557–58 (9th Cir. 1990).

Moreover, a later-executed writing can validate and memorialize an earlier oral transfer ab initio, confirming ownership from the time of the original grant. *Billy-Bob Teeth, Inc. v. Novelty, Inc.*, 329 F.3d 586, 591–92 (7th Cir. 2003); *Arthur Rutenberg Homes, Inc. v. Drew Homes, Inc.*, 29 F.3d 1529, 1532–33 (11th Cir. 1994). Courts have consistently enforced post hoc memorialization as satisfying § 204(a), even where executed years after the original allocation of rights. *Billy-Bob Teeth*, 329 F.3d at 592. Because ownership is a prerequisite to infringement, and infringement is a prerequisite to any copyright-based criminal or fraud predicate, § 204(a) operates as a threshold issue. Absent a defective transfer under § 204(a), there can be no unlawful taking of copyright rights. See *Imperial Residential*, 70 F.3d at 99 (ownership must be established before infringement analysis proceeds).

Civil RICO liability requires at least two legally viable predicate acts. 18 U.S.C. § 1961(1), (5). Where the underlying substantive theory fails as a matter of law, the RICO claim collapses. *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 15 (1st Cir. 2000) (requiring properly pleaded predicate acts); *BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 357–58 (S.D.N.Y. 2014) (dismissing RICO claims predicated on deficient copyright allegations). Accordingly, if the transfers challenged in the Complaint satisfy § 204(a), Plaintiffs cannot

establish an unlawful deprivation of rights, cannot establish criminal infringement, and therefore cannot plead a RICO predicate as a matter of law.

**B.     The Complaint Alleges Executed Writings That Satisfy Section 204(a)**

Plaintiffs' own pleadings acknowledge the existence of executed written agreements allocating publishing interests and authorship shares. The Complaint references, inter alia, a "Main Title Music Composition Agreement" (Doc. 1 at 45; ¶¶ 60–61), a "Memorandum of Understanding" (id. ¶ 61), a "Songwriters' Split Agreement" (Doc. 1 at 46; ¶ 67), multiple Copyright Office registrations reflecting the challenged ownership allocations (Doc. 1 at 11, 53–56; ¶¶ 29, 95–106, including ¶ 102), and a letter agreement for the musical composition "No Lo Trates" (Doc. 1 at 47; ¶ 68).

For example, the pleadings allege that on July 5–6, 2018, a "Main Title Music Composition Agreement" and accompanying "Memorandum of Understanding" were circulated and executed for *Buena Vida (Remake),* assigning Rafael Pina a ten percent (10%) publishing share and identifying authorship (Doc. 1 at 45–46; ¶¶ 60–61). The Complaint further alleges that on November 14, 2018, a "Songwriters' Split Agreement" for *Inolvidable (Remix)* was signed and allocated a five percent (5%) publishing share to Pina (Doc. 1 at 47; ¶ 67). It likewise alleges that on April 1, 2019, a signed letter agreement for *No Lo Trates* reflected Pina's co-authorship and a three percent (3%) publishing interest (Doc. 1 at 47; ¶ 68).

These allegations concede the existence of written, signed instruments allocating ownership interests. Nowhere do Plaintiffs allege that these writings lack signatures, fail to identify the works, omit present-intent transfer language, or otherwise violate § 204(a). Instead, Plaintiffs assert that certain signatories acted "without consent" or exceeded internal authority. But § 204(a)

does not invalidate a transfer based on internal corporate disputes, alleged concealment, or later dissatisfaction with the allocation. The statute asks only whether a signed writing memorializes the conveyance. *Playboy*, 53 F.3d at 557. Courts repeatedly reject attempts to convert internal authority disputes into § 204 invalidity arguments. See *Effects Assocs.*, 908 F.2d at 557–58 (enforcing transfer based on written manifestation of intent).

Where, as here, the pleadings admit the existence of signed written agreements allocating rights, Plaintiffs have not pleaded a defective transfer. They have pleaded, at most, a governance or fiduciary dispute which do not implicate matters under § 204(a).

**C.    González's Alleged Authority to Determine Splits Confirms Validity Under § 204**

It is undisputed that González possessed authority to determine or memorialize publishing splits on behalf of the relevant corporate entities.   The Complaint itself alleges that Ayala-Rodríguez "entrusted the day-to-day management of El Cartel's and Los Cangris' internal affairs to his then-wife, González-Castellanos," who served as President and Director of both entities. (Doc. 1 at 10; ¶ 25). It further pleads that Ayala-Rodríguez "entrust[ed] the management of El Cartel and Los Cangris … to Mireddys González-Castellanos." (Doc. 1 at 10–11; ¶ 26). Consistent with that delegated role, Plaintiffs allege that González-Castellanos "served as a key facilitator … by repeatedly documenting and circulating split sheets and publishing allocations," and that she "memorialized fraudulent percentages in multiple songs and transmitted these false records … [and] prepar[ed], transmi[tted], and confirm[ed] split sheets." (Doc. 1 at 68–70; ¶ 118). These pleaded facts affirmatively acknowledge that González possessed and exercised authority to determine or memorialize publishing splits on behalf of the relevant corporate entities. (Doc. 1 at 10–11; ¶¶ 25–26, 118).

These allegations are dispositive. If González was authorized, as a Los Cangris executive, to allocate and memorialize ownership interests, then the resulting written agreements reflect valid

transfers under § 204(a). Agency principles reinforce this conclusion. A corporate officer or authorized representative may execute a valid copyright transfer on behalf of the entity. See Arthur Rutenberg Homes, 29 F.3d at 1532–33 (recognizing enforceability of transfer executed by authorized corporate representative). Section 204(a) requires a signed writing by "the owner of the rights conveyed," and a duly authorized agent satisfies that requirement. Id. Plaintiffs cannot simultaneously allege that González had authority to determine splits and that the resulting executed writings are statutorily void. Section 204(a) turns on the existence of a signed writing reflecting a present transfer of rights, not on subjective disputes over internal approval procedures. Playboy, 53 F.3d at 557. This conclusion is further reinforced when confirmed in a later document (the BTSA) signed by the plaintiff himself. Thus, by Plaintiffs' own allegations, the transfers were executed by him or by an authorized representative and memorialized in signed written instruments. That is the very paradigm § 204(a) validates.

D.      **Without a Defective Transfer, There Is No Predicate Act and No RICO Claim**

RICO requires at least two predicate acts constituting "racketeering activity." 18 U.S.C. § 1961(5). Plaintiffs attempt to characterize the alleged authorship allocations as wire fraud or criminal copyright infringement. But criminal copyright infringement requires willful violation of a valid copyright right. 17 U.S.C. § 506(a); *United States v. Liu*, 731 F.3d 982, 989 (9th Cir. 2013). If the transfers are valid under § 204(a), then no copyright right was unlawfully taken. Without unlawful taking, there can be no willful infringement. And without a viable infringement or fraud theory, there is no predicate act. See *BWP Media*, 69 F. Supp. 3d at 357–58 (dismissing RICO claim where underlying copyright theory failed).

Courts consistently caution against transforming commercial or contractual disputes into RICO actions. Efron, 223 F.3d at 20 (rejecting effort to convert business dispute into racketeering case). Plaintiffs' allegations concern allocation of publishing percentages documented in executed

agreements. That is the domain of contract and corporate law, not organized crime. Section 204(a) is therefore dispositive at the threshold. If the writings identified in the Complaint satisfy the statutory requirements, and Plaintiffs' own allegations establish that they do, then the transfers are valid as a matter of law. Without an invalid transfer, there is no unlawful deprivation of rights. Without unlawful deprivation, there is no criminal infringement or fraud. Without a viable predicate offense, there is no RICO claim. It must be borne in mind that the 2019 BTSA effectuating the transfer of ownership rights was expressly validated and authorized by Ayala himself. That agreement memorialized the transfer of rights in eighteen (18) musical compositions. These are the very works now alleged to have been fraudulently conveyed to Co-Defendant Pina. In the same instrument, executed before a Notary Public, Ayala expressly warranted that the ownership percentages set forth therein were accurate and that such rights were conveyed free and clear of any claims, encumbrances, or defects whatsoever. (Exh. 1 at 7-10; under the section of Representations and Warranties and Conditions of Purchase). Accordingly, the RICO counts must be dismissed under Rule 12(b)(6).

## IV.   THE RICO CLAIM AGAINST GONZÁLEZ MUST BE DISMISSED FOR FAILURE TO PLEAD A COGNIZABLE ENTERPRISE OR RACKETEERING ACTIVITY

### A.   Legal Standard: A RICO Plaintiff Must Plead a Structurally Distinct Enterprise and a Plausible Pattern of Racketeering Activity

To state a claim under 18 U.S.C. § 1962(c), a plaintiff must plausibly allege that the defendant conducted or participated in the conduct of an enterprise's affairs through a pattern of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). The Supreme Court has made clear that a RICO claim requires proof of "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Boyle v. United States*, 556 U.S. 938, 944–45 (2009). An "enterprise" under § 1961(4) includes any legal entity or any association-in-fact, but the alleged

enterprise must possess a structure separate and apart from the pattern of racketeering activity itself. *United States v. Turkette*, 452 U.S. 576, 583 (1981). The enterprise must have at least three structural features: a common purpose, relationships among those associated, and longevity sufficient to pursue the enterprise's purpose. *Boyle*, 556 U.S. at 946. The First Circuit requires that the enterprise have an existence distinct from the alleged racketeering acts and that the defendant participate in directing its affairs. *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 15–16 (1st Cir. 2000).

Critically, a RICO "person" must be distinct from the RICO "enterprise." 18 U.S.C. § 1962(c); *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161–62 (2001). A complaint fails where it merely repackages routine corporate relationships or business dealings as an enterprise. *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 226–27 (7th Cir. 1997). In addition, a plaintiff must plead a "pattern" of racketeering activity by alleging at least two predicate acts that are related and amount to or pose a threat of continued criminal activity. 18 U.S.C. § 1961(5); *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239–40 (1989). The First Circuit has emphasized that closed-ended continuity requires a series of related predicates extending over a substantial period of time, while open-ended continuity requires a threat of ongoing criminal conduct. *Efron*, 223 F.3d at 16–18.

Where RICO predicates sound in fraud, Rule 9(b) applies and requires that the time, place, and content of the alleged misrepresentations be pleaded with particularity. *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 291 (1st Cir. 1987). Conclusory allegations of fraud or generalized accusations of wrongdoing are insufficient. Id. Failure to plausibly plead a distinct enterprise, structural organization, or a legally sufficient pattern of racketeering activity mandates dismissal under Rule 12(b)(6). *Efron*, 223 F.3d at 20.

**B.    The Complaint Fails to Plead a Cognizable RICO Enterprise as to González**

The RICO claim against Mireddys González fails at the threshold because the Complaint does not plausibly allege the structural hallmarks required under *Boyle* and *Turkette*. Although Plaintiffs invoke the label of an "association-in-fact enterprise," the pleading never identifies an enterprise with a structure or purpose distinct from the alleged publishing allocations and copyright filings themselves. Instead, the allegations merely describe routine music-industry interactions among existing business actors — precisely the type of repackaging courts reject. *Turkette*, 452 U.S. at 583; *Efron*, 223 F.3d at 18–20.

First, the Complaint fails to plead a common purpose separate from the alleged predicate acts. An association-in-fact enterprise must exist for a purpose independent of the racketeering activity itself. *Boyle*, 556 U.S. at 946. Here, Plaintiffs allege only that defendants manipulated split sheets to allocate publishing rights and divert income (Doc. 1, ¶¶ 34–35). That formulation merely restates the alleged misconduct; it does not identify an organizational objective distinct from the supposed fraud. Courts routinely dismiss RICO claims where the enterprise's alleged purpose is indistinguishable from the predicate acts. *Efron*, 223 F.3d at 18.

Second, the Complaint does not plead the required structural relationships demonstrating that González functioned as part of a continuing unit. *Boyle* requires factual allegations showing relationships among associates that form an organized framework. 556 U.S. at 946. The pleading instead alleges only that González handled management of Los Cangris and El Cartel and participated in communications regarding publishing allocations (Doc. 1, ¶¶ 26–28, 34). These allegations describe routine corporate activity, not participation in a structured criminal organization. The Complaint contains no factual allegations describing hierarchy, coordinated decision-making, or differentiated criminal roles involving González.

Third, the Complaint fails to allege the longevity necessary to support an association-in-fact enterprise as to González. Although Plaintiffs reference conduct spanning several years, the pleaded facts describe discrete publishing transactions tied to specific songs and emails (Doc. 1, ¶¶ 61–65). Courts in the First Circuit repeatedly hold that allegations tied to a finite set of business dealings do not establish the structural longevity required by *Boyle*. *Efron*, 223 F.3d at 18–19. Nothing in the Complaint plausibly alleges that González participated in an ongoing criminal organization with continuity of structure and purpose.

Fourth, the Complaint impermissibly collapses the distinctness requirement of § 1962(c). A RICO "person" must be separate from the alleged enterprise. *Cedric Kushner*, 533 U.S. at 161–62. Plaintiffs allege that the supposed enterprise consists of Pina-Nieves, González, and the very corporate entities through which they conducted music publishing operations (Doc. 1, ¶¶ 26, 34–39). Such allegations merely aggregate related business actors performing their regular functions, which courts consistently find insufficient. See *Fitzgerald*, 116 F.3d at 226–27.

Fifth, the Complaint does not plausibly allege that González directed the affairs of the purported enterprise, as required by the First Circuit. See *Efron*, 223 F.3d at 15–16; *Reves*, 507 U.S. at 179. The pleading attributes strategic control and orchestration of the alleged scheme to Pina-Nieves, who is described as embedding fabricated claims and monetizing them (Doc. 1, ¶¶ 37–39). By contrast, González is alleged only to have managed corporate affairs and participated in communications concerning publishing shares (Doc. 1, ¶¶ 26–28, 61). Allegations of ministerial or administrative participation do not satisfy the operation-or-management test.

Sixth, the Complaint itself confirms that the challenged conduct arose from ordinary corporate relationships. Plaintiffs allege that Ayala entrusted González with management of Los

16

Cangris and El Cartel and that she served as President and Director of those entities (Doc. 1, ¶ 26). These allegations underscore that the complained-of actions occurred within routine business administration, not within a structurally distinct criminal enterprise. The First Circuit has repeatedly warned that RICO cannot be used to federalize internal business disputes. *Efron*, 223 F.3d at 20.

Finally, the enterprise allegations are wholly conclusory. The Complaint asserts in generalized terms that defendants manipulated publishing allocations and embedded claims in registries (Doc. 1, ¶¶ 34–39), but it provides no non-conclusory facts showing how González and the other defendants formed an organization separate from their ordinary publishing and management roles. Such "labels and conclusions" are insufficient under *Twombly* and *Iqbal*, particularly in the RICO context.

In sum, the pleading describes, at most, a dispute over publishing allocations carried out through ordinary music-industry communications. Under controlling Supreme Court and First Circuit precedent, those omissions are fatal. Because Plaintiffs fail to plead a cognizable RICO enterprise as to González, the § 1962 claims against her must be dismissed pursuant to Rule 12(b)(6).

## C.    The Complaint Fails to Plead a Pattern of Racketeering Activity as to González

Even assuming arguendo that an enterprise was adequately alleged, the Complaint fails to plead a legally cognizable pattern of racketeering activity attributable to González.

First, the alleged acts consist of publishing allocations, executing agreements, and copyright registrations. These activities are lawful on their face and consistent with industry practice. Courts consistently hold that contractual disputes and disagreements over ownership

percentages do not constitute racketeering activity. *Efron*, 223 F.3d at 20 (warning against converting commercial disputes into RICO claims).

Second, Plaintiffs fail to allege continuity as required under *H.J. Inc.*, 492 U.S. at 239–40. The allegations concern a discrete set of publishing transactions tied to specific musical works. Such conduct, even if disputed, reflects a closed set of business dealings, not a continuing criminal enterprise posing a threat of ongoing racketeering activity. See *Efron*, 223 F.3d at 18 (no continuity where alleged scheme had limited scope and purpose).

Third, to the extent Plaintiffs rely on fraud-based predicates such as wire fraud, the Complaint fails to meet Rule 9(b)'s heightened pleading standard. It does not identify specific fraudulent statements made by González, the particular false representations, the dates and recipients of such communications, or how those statements were materially false. *Becher*, 829 F.2d at 291. Conclusory assertions that documents were "fraudulent" or "unauthorized" are insufficient.

Without particularized allegations of fraudulent intent, material misrepresentation, and reliance, there can be no viable mail or wire fraud predicate. See *Efron*, 223 F.3d at 17 (affirming dismissal where complaint failed to plead fraud-based predicates with specificity).

## D.    The Allegations Reflect a Commercial Dispute, Not Racketeering Activity

The Supreme Court has cautioned that RICO is not a vehicle for transforming ordinary business conflicts into federal racketeering claims. *Sedima*, 473 U.S. at 500 (warning against overextension of RICO beyond its intended scope). The First Circuit has echoed this admonition, emphasizing that "garden-variety fraud" or contract disputes do not automatically constitute racketeering activity. *Efron*, 223 F.3d at 20.

The allegations against González concern internal publishing allocations, execution of agreements, and administration of corporate affairs. These are paradigmatic commercial functions.

The Complaint does not plausibly allege organized criminal conduct, a structurally distinct enterprise, or a continuing threat of racketeering activity. Absent a properly pleaded enterprise and a legally sufficient pattern of racketeering activity, the RICO claim against González fails as a matter of law and must be dismissed pursuant to Rule 12(b)(6).

## V.     THE COMPLAINT IS TIME-BARRED UNDER RICO AND COPYRIGHT LAW

### A.     Legal Standard

Civil RICO claims are subject to a four-year statute of limitations. *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987). The limitations period accrues under the injury-discovery rule, meaning it begins to run when the plaintiff knew or should have known of his injury, not when he discovered a pattern of racketeering activity or the full extent of the alleged scheme. *Rotella v. Wood*, 528 U.S. 549, 553–55 (2000). The Supreme Court has expressly rejected both the "injury and pattern discovery rule" and the "last predicate act rule." *Id.* at 558; *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 187–89 (1997).

The First Circuit has long adhered to this injury-discovery accrual rule. A RICO claim accrues "when a plaintiff knew or should have known of his injury." *Rodríguez v. Banco Central*, 917 F.2d 664, 666 (1st Cir. 1990). "Discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." *Lares Grp., II v. Tobin*, 221 F.3d 41, 44 (1st Cir. 2000) (quoting *Rotella*, 528 U.S. at 555). Where the facts establishing accrual are clear from the face of the pleadings, dismissal at the Rule 12(b)(6) stage is appropriate.

The Copyright Act imposes a separate three-year statute of limitations. 17 U.S.C. § 507(b); *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 670 (2014). Ownership disputes are likewise governed by the three-year limitations period and accrue when the plaintiff knew or had reason to know of the asserted adverse ownership claim. See *Petrella*, 572 U.S. at 670; *Santa-Rosa v. Combo Records*, 471 F.3d 224, 227–28 (1st Cir. 2006). Later acts do not revive stale ownership

challenges. *Petrella*, 572 U.S. at 672–73. Tolling under the doctrine of fraudulent concealment in RICO Cases is narrowly applied and requires wrongful concealment, failure to discover the operative facts within the limitations period, and due diligence by the plaintiff. *Berkson v. Del Monte Corp.*, 743 F.2d 53, 55 (1st Cir. 1984). The Supreme Court has cautioned that equitable tolling is the exception, not the rule. *Rotella*, 528 U.S. at 560.

Under these principles, RICO claims filed on November 29, 2025, are limited to injuries discovered within four years of filing, i.e., no earlier than November 29, 2021, and copyright ownership challenges are limited to three years preceding suit.

## B.    Ayala Knew of Pina's Ownership Splits no Later Than the 2019 Catalogue Sale

Under this dismissal argument section, we will go into the contents of the Binding Term Sheet Agreement[1] (BTSA), which the plaintiff knowingly did not make specific reference to in the complaint. We do so since this document is central to the plaintiff's claim, and it is unlikely to be challenged by the plaintiff as per its own pleadings.

It is well settled in the First Circuit that, in resolving a Rule 12(b)(6) motion, a court may consider not only the complaint but also documents the authenticity of which is not disputed, official public records, and documents central to the plaintiff's claim. *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993). This includes documents that are expressly referenced in the complaint or whose factual allegations are dependent upon them. Id. The First Circuit has articulated this principle with particular clarity: "when a complaint's factual allegations are expressly linked to, and admittedly dependent upon, a document (offered by the movant), the authenticity of which is

---

[1] The Binding Term Sheet Agreement was substituted by a long form contract version entitled the Asset Purchase Agreement.

not challenged, that document effectively merges into the pleadings." *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 17 (1st Cir. 1998). This rule prevents plaintiffs from "thwart[ing] the consideration of a critical document merely by omitting it from the complaint." Id. Accordingly, where a plaintiff's theory depends upon the contents of a document, but the plaintiff selectively omits that document to avoid its legal consequences, the Court may properly consider it at the motion to dismiss stage. *Watterson*, 987 F.2d at 3; *Beddall*, 137 F.3d at 17.

**The Allegations Against Prendi Publishing Are Inextricably Linked to the BTSA**

Defendant No. 7, Prendi Publishing Trust d/b/a Gasolina Publishing Co. (Prendi), is accused in the Complaint of filing "false" copyright registrations to secure future royalty flows to the alleged enterprise. Plaintiffs characterize those registrations as predicate acts of fraud and as part of the supposed racketeering scheme. However, the registrations referenced in the Complaint are not freestanding acts. They are the direct implementation of the ownership transfers memorialized in the 2019 BTSA with MA Rights LLC (MA Rights) documents signed and authorized by Plaintiff himself that gave way to the assignment of these rights to codefendant Prendi. Under those agreements, Plaintiffs transferred ownership rights, represented and warranted that such rights were free of any claims or encumbrances, and authorized their exploitation and registration accordingly. (Exh. 1 at 7-10; Under the Representations and Warranties and Conditions of Purchase sections)

Prendi is named in this action precisely because Plaintiffs transferred ownership rights to MA Rights in the BTSA, which in turn transferred to Prendi. It is Prendi, as transferee, who, with Ayala's authorization, proceeded to register those rights in its own name as Gasolina Pub. Co. with the U.S. Copyright Office.  Exhs. 1 to 5. The alleged "fraudulent registrations" are therefore

inextricably linked to, and entirely dependent upon, the contractual transfer embodied in the BTSA. The Complaint's request for relief underscores this centrality. Plaintiffs expressly seek correction of the Copyright Office registrations. Any such correction necessarily requires examination of the underlying ownership documents that authorized the registrations by Prendi in the first place. The validity of Prendi's registrations cannot be assessed in isolation; it turns on whether the ownership transfers reflected in the Term Sheet were valid and authorized.

Under *Beddall*, where a complaint's factual allegations are expressly linked to and dependent upon a document, that document merges into the pleadings. 137 F.3d at 17. Plaintiffs cannot maintain that the registrations were "fraudulent" while simultaneously omitting the very agreement that authorized those registrations. The BTSA is not collateral; it is central to the claim.

**Plaintiffs' Omission of the Term Sheet Cannot Shield It from Consideration**

The deliberate omission of the BTSA from the Complaint appears calculated to avoid judicial scrutiny of a document that would have immediate and dispositive consequences, beginning with Ayala's own standing. If Plaintiffs transferred all ownership rights to Prendi and warranted that those rights were free of any claims, then Plaintiffs may lack any present ownership interest in the copyrights they now seek to vindicate. Civil RICO requires injury to "business or property." 18 U.S.C. § 1964(c); *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). If Plaintiffs no longer owned the relevant rights at the time of the alleged injury, they cannot establish injury to their own property.

By attempting to sever the registrations from the transfer agreement that authorized them, Plaintiffs seek to "thwart the consideration of a critical document merely by omitting it from the complaint." *Beddall*, 137 F.3d at 17. The First Circuit's merger doctrine exists precisely to prevent

this tactic. Because the allegations against Prendi are expressly linked to, and dependent upon, the ownership transfers reflected in the BTSA involving MA Rights, the Court may and should consider that agreement in resolving this motion. Once considered, it becomes clear that Prendi's registrations were not independent predicate acts but ministerial implementations of a contractually authorized transfer.

**The Centrality of the Term Sheet Undermines the RICO Theory**

The RICO theory depends on characterizing Prendi's copyright registrations as fraudulent acts designed to divert royalty streams. But if those registrations were made pursuant to a binding agreement signed and authorized by Plaintiff, one that transferred ownership rights and warranted their validity, then the registrations are lawful consequences of that agreement, not racketeering acts. The BTSA is therefore dispositive not only of the claims against Prendi, but of the broader RICO theory. It demonstrates that the dispute arises from a contractual allocation of rights, one acknowledged and warranted by Plaintiff, not from a criminal enterprise. Under *Watterson* and *Beddall*, the Court is empowered to consider that agreement at this stage. When it does, the Complaint's theory against Prendi collapses, and with it a central pillar of the alleged racketeering scheme. Accordingly, the claims against Prendi Publishing and the RICO claims predicated upon its copyright registrations should be dismissed pursuant to Rule 12(b)(6).

The pleadings and incorporated transactional documents establish that Ramón L. Ayala Rodríguez had actual knowledge of the challenged ownership splits no later than October 2019, when he executed before a notary Public the BTSA conveying his publishing catalog to MA Rights Capital, LLC.

This BTSA included the splits of the songs listed 1 to 18 which led to the copyrights office alleged fraudulent registrations.

| | Song Title | Complaint Citation | Exh. 1 | Term Sheet Status |
|---|---|---|---|---|
| 1 | PERDIDO POR EL MUNDO (Nov. 2010) | P. 102; ¶ 155 | p. 57 | Included |
| 2 | LLEVO TRAS DE TI (Aug. 2012) | P. 101; ¶ 154 | p. 48 | Included |
| 3 | MAYOR QUE YO 3 (Oct. 2015) | P. 75; ¶ 127 | p. 50 | Included |
| 4 | LA ROMPECORAZONES (Jan. 2017) | P. 78; ¶ 130 | p. 47 | Included |
| 5 | BELLA Y SENSUAL (July 2017) | P. 79; ¶ 131 | p. 33 | Included |
| 6 | VUELVE (Sept. 2017) | P. 82; ¶ 134 | p. 64 | Included |
| 7 | EL DESORDEN (Nov. 2017) | P. 84; ¶ 136 | — | Included[2] |
| 8 | OTRA COSA (Dec. 2017) | P. 76; ¶ 128 | p. 55 | Included |
| 9 | TODO COMIENZA EN LA DISCO (Dec. 2017) | P. 77; ¶ 129 | p. 62 | Included |
| 10 | DURA REMIX (Apr. 2018) | P. 91; ¶ 143 | p. 39 | Included |
| 11 | ZUM ZUM (June 2018) | P. 81; ¶ 133 | p. 65 | Included |
| 12 | BUENA VIDA (July 2018) | P. 80; ¶ 132 | p. 34 | Included |
| 13 | BUENA VIDA REMAKE (July 2018) | P. 83; ¶ 135 | p. 34 | Included |
| 14 | INOLVIDABLE REMIX (Oct. 2018) | P. 85; ¶ 137 | p. 45 | Included |
| 15 | TE LO DIJE (Feb. 2019) | P. 87; ¶ 139 | p. 62 | Included |
| 16 | NO LO TRATES (Apr. 2019) | P. 86; ¶ 138 | p. 52 | Included |
| 17 | SI SUPIERAS (June 2019) | P. 88; ¶ 140 | p. 60 | Included |
| 18 | RUNAWAY (June 2019) | P. 89; ¶ 141 | p. 59 | Included |
| 19 | QUE MAL TE FUE (June 2020) | P. 90; ¶ 142 | — | **Not Included** |
| 20 | RELACION REMIX (Sept. 2020) | P. 93; ¶ 145 | — | **Not Included** |
| 21 | QUE MAL TE FUE REMIX (Oct. 2020) | P. 92; ¶ 144 | — | **Not Included** |
| 22 | DE VUELTA PA LA VUELTA (Dec. 2020) | P. 94; ¶ 146 | — | **Not Included** |
| 23 | INEDITO (Jan. 2021) | P. 95; ¶ 147 | — | **Not Included** |
| 24 | RAM PAM PAM (Apr. 2021) | P. 96; ¶ 148 | — | **Not Included** |

---

[2] Did not include a complete split detail in the BTSA.

| Song Title | Complaint Citation | Exh. 1 | Term Sheet Status |
|---|---|---|---|
| 25 SUBELE EL VOLUMEN (July 2021) | P. 97; ¶ 149 | — | **Not Included** |
| 26 ME FELICITO (Sept. 2021) | P. 98; ¶ 150 | — | **Not Included** |
| 27 METELE AL PERREO (Sept. 2021) | P. 101; ¶ 153 | — | **Not Included** |
| 28 ZONA DEL PERREO (Mar. 2022) | P. 99; ¶ 151 | — | **Not Included** |
| 29 MAYOR QUE USTED (June 2022) | P. 100; ¶ 152 | — | **Not Included** |

The record reflects that the songs identified as items 1 through 18 in the foregoing list were expressly encompassed within the parties' BTSA. By contrast, the songs identified as items 19 through 29 were not part of the BTSA because they were created and released after the parties executed that agreement. That agreement expressly defined the "Assets" to include all sound recordings and musical compositions owned or controlled by Seller "from the beginning of time" through the precise moment the contract was entered into in 2019. (The BTSA Exh. 1, which lists detailed ownership and publishing splits that enumerate specific works referred to above from 1 to 18 and reflect percentages attributed to Rafael A. Pina-Nieves). [3]

The Term Sheet further contained representations and warranties that Seller was the "sole and exclusive owner" of the Assets and that the Assets were "free and clear from any and all liens and encumbrances." (Exh. 1 at 7-10; Under the Representations and Warranties and Conditions of Purchase sections) Ayala personally appeared before a California notary and acknowledged execution of the BTSA.  (Exh. 1 at 1) Thereafter, he also consented to the assignment of the right

---

[3] Including, inter alia, "Bella Y Sensual" (7.00%), "Buena Vida" (5.00%), "Dura Remix" (2.50%), "Te Lo Dije" (11.25%), And "Todo Comienza En La Disco" (3.75%).

of MA to Prendi and Prendi's assignment to Concord DY Pub Assets LLC (Concord), who is the actual owner of these rights today. Exhs. 2 to 5.

Under *Rodríguez* and *Lares Group*, accrual begins when the plaintiff knew or should have known of his injury. 917 F.2d at 666; 221 F.3d at 44. By executing a binding sale agreement incorporating detailed split of the first 18 songs listed & schedules identifying Pina's percentages, Ayala had actual knowledge of the "manner and form" of the allocations he now characterizes as fraudulent. His consent and awareness in 2019 started the RICO limitations clock. Under *Rotella*, later discovery of additional details does not delay accrual. 528 U.S. at 555.

Because this action was filed on November 29, 2025, any injury known in 2019 falls well outside RICO's four-year limitations period and copyright's three-year limitations period.

## C.    The Allegations of Concealment Cannot Overcome the 2019 Transactional Record

Plaintiffs allege that they first "discovered" the scheme in December 2024 upon assuming management of Los Cangris. However, such conclusory assertions cannot override documentary evidence demonstrating actual knowledge years earlier.

Under the First Circuit's accrual framework, "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." *Lares Group*, 221 F.3d at 44. The 2019 executed Term Sheet disclosed the precise ownership splits now challenged. That document constitutes, at minimum, "storm warnings" sufficient to trigger inquiry notice under First Circuit precedent. See *Young v. Lepone*, 305 F.3d 1, 8 (1st Cir. 2002).

Fraudulent concealment requires diligence. *Berkson*, 743 F.2d at 55. Plaintiffs plead no facts showing that Ayala, after signing and warranting ownership splits in 2019, exercised diligence yet was prevented from discovering the alleged injury. To the contrary, the split schedules were attached to a binding sale transaction for hundreds of millions of dollars.

Under *Álvarez-Maurás v. Banco Popular of Puerto Rico*, accrual occurs when the plaintiff knows funds are missing or ownership has been affected, even if he does not yet understand the precise mechanics of the alleged wrongdoing. Here, Ayala's execution of a binding asset sale incorporating detailed split schedules for the first 18 listed songs establishes knowledge as a matter of law and as we shall see a storm warning of the rest of the listed songs.

Even assuming arguendo that the 2019 BTSA did not place Plaintiffs on inquiry notice of the alleged fraud, a premise squarely contradicted by the documentary record, the Complaint still fails the four-year RICO statute of limitations for the overwhelming majority of the alleged predicate acts. Civil RICO claims accrue when the plaintiff knew or should have known of the injury. Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143, 156 (1987); Rodríguez v. Banco Central, 917 F.2d 664, 666 (1st Cir. 1990). Because this action was filed on November 29, 2025, only alleged predicate acts occurring on or after November 29, 2021, could even facially fall within the four-year limitations window.

Applying that rule to the Complaint's own chronology demonstrates that nearly all of Plaintiffs' song-based allegations remain time-barred. At most, only the overt acts tied to the following compositions could arguably survive an initial temporal screen are, Per*dido Por El Mundo*, (Doc. 1 ¶ 155*), Llevo Tras De Ti,* (Doc. 1 ¶ 154), *Me Felicito*, (Doc. 1 ¶ 150), *Métele Al Perreo*, (Doc. 1 ¶ 153), *Zona Del Perreo*, (Doc. 1 ¶ 151), *Mayor Que Usted*, (Doc. 1 ¶ 152). Even granting Plaintiffs every favorable inference, these six works represent the outer boundary of what could arguably fall within four years of filing. All other alleged song-based predicate acts predate November 29, 2021, and are independently time-barred under Rotella v. Wood, 528 U.S. 549, 553–58 (2000), and Lares Group, II v. Tobin, 221 F.3d 41, 44 (1st Cir. 2000).

However, the analysis does not end there. Even as to these six compositions, the RICO claims remain untimely because the Complaint itself establishes that Plaintiffs, exercising reasonable diligence, would have discovered the alleged injury years earlier. The First Circuit applies an objective inquiry-notice standard: the statute begins to run when sufficient "storm warnings" would alert a reasonable plaintiff to the possibility of fraud. Young v. Lepone, 305 F.3d 1, 8 (1st Cir. 2002). Once such warnings exist, a plaintiff is charged with knowledge that a reasonably diligent investigation would have uncovered. Id. Here, the Complaint pleads a long-running course of publishing allocations, split sheets, copyright registrations, and royalty distributions openly reflecting the very ownership percentages Plaintiffs now challenge. See, e.g., Doc. 1 ¶¶ 25–26, 54–72, 118. These publicly documented allocations, many confirmed by email and formal agreements, constitute classic inquiry notice as a matter of law. Under First Circuit precedent, a plaintiff cannot "close his eyes to facts that should prompt him to investigate." *Young*, 305 F.3d at 8.

Moreover, Plaintiffs' own theory defeats any claim of delayed discovery. The alleged scheme depends on routine industry documents, split sheets, registrations, and royalty allocations, that were continuously available to the corporate principals who, by Plaintiffs' own pleading, controlled Los Cangris and its publishing administration. (Doc. 1 ¶¶ 25–26, 118). Where the alleged injury is embedded in business records within the plaintiff's control, courts routinely find inquiry notice well before the limitations cutoff. Nor have Plaintiffs plausibly alleged fraudulent concealment sufficient to toll the statute. Tolling requires wrongful concealment plus due diligence. Berkson v. Del Monte Corp., 743 F.2d 53, 55 (1st Cir. 1984). The Complaint offers only conclusory assertions of concealment and does not plead any specific acts that prevented discovery despite reasonable diligence. Such allegations are legally insufficient to toll RICO's limitations

period. Rotella, 528 U.S. at 560. Critically, once Plaintiffs were on notice of the alleged misallocation scheme, which the pleadings show occurred years earlier, later song releases cannot restart the clock. The Supreme Court has expressly rejected efforts to revive stale RICO claims through later predicate acts. Klehr v. A.O. Smith Corp., 521 U.S. 179, 187–89 (1997). The First Circuit applies the same principle: subsequent acts that merely implement the same alleged injury do not create a new accrual date. Lares Group, 221 F.3d at 44.

Thus, even under Plaintiffs' most generous timeline, the six songs identified above cannot salvage the RICO claim. At most, they reflect continued commercial exploitation of ownership allocations that Plaintiffs either knew or, with reasonable diligence, would have discovered long before November 2021. Accordingly, the RICO claims are time-barred in the overwhelming majority and independently defective as to the few remaining works. Dismissal under Rule 12(b)(6) is warranted.

### D.    The Copyright Ownership Claims Are Independently Time-Barred

Ownership disputes accrue when a plaintiff is put on notice of an adverse ownership claim. *Santa-Rosa*, 471 F.3d at 227–28. The 2019 split schedules expressly identified Pina's percentages of the first 18 songs listed. Any challenge to those allocations had to be brought within three years of that date.

Under *Petrella*, the statute of limitations bars claims seeking relief for acts occurring outside the three-year window, and later acts do not revive stale ownership disputes. 572 U.S. at 672–73. The November 2025 filing is more than six years after the 2019 transaction and is therefore untimely as to ownership challenges.

### E.    Later Alleged Predicate Acts Do Not Revive Time-Barred Injuries

The Supreme Court has rejected the "last predicate act" rule. *Klehr*, 521 U.S. at 187–89. A plaintiff may not bootstrap new alleged acts to recover for injuries caused by earlier time-barred conduct. Id. Because Ayala knew of the alleged fraudulent ownership splits in 2019, any injury flowing from those allocations accrued at that time. Post-2021 royalty payments or registrations cannot resurrect time-barred claims. Under *Rotella*, accrual does not await discovery of the full pattern. 528 U.S. at 558.

Accordingly, any alleged injury arising from the ownership allocations reflected in the 2019 Term Sheet falls outside both the RICO and Copyright limitations periods. Songs listed 19 to 29 post-2019 BTSA are also time-barred, since the plaintiff was aware of the alleged fraudulent ownership-allocation scheme and did nothing. The Complaint was filed on November 29, 2025. RICO claims are limited to injuries discovered within four years of filing, and copyright ownership claims are limited to three years. The 2019 BTSA, executed and warranted by Ayala and incorporating detailed split schedules, establishes that knowledge of the challenged ownership allocations was obtained no later than October 2019. Under *Malley-Duff*, *Rotella*, *Rodríguez*, *Lares Group*, and *Petrella*, the claims are time-barred as a matter of law. The Complaint should therefore be dismissed in its entirety pursuant to Rule 12(b)(6).

## VI.    THE RICO DAMAGES CLAIMS FAIL AS A MATTER OF LAW FOR LACK OF CLEAR AND DEFINITE INJURY

### A.    Legal Standard Governing Civil RICO Damages

The civil remedy provision of RICO authorizes recovery only for "[a]ny person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). The Supreme Court has held that § 1964(c) requires not only a statutory violation, but also a concrete injury to business or property and proximate causation between the violation and the injury. *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992).

The First Circuit has made clear that a civil RICO plaintiff must allege a present, non-speculative injury to an existing property interest. *DeMauro v. DeMauro*, 115 F.3d 94, 98–99 (1st Cir. 1997). In *DeMauro*, the court rejected claims premised on uncertain future entitlements, explaining that "it is hard to see how a court would calculate damages now" where the injury depends on contingencies. Id. at 99. Similarly, the First Circuit has held that speculative or hypothetical injuries are insufficient to sustain a RICO claim. *Lincoln House, Inc. v. Dupre*, 903 F.2d 845, 847–48 (1st Cir. 1990).

Federal courts consistently require that RICO damages be "clear and definite," not contingent, hypothetical, or dependent upon future events. A cause of action does not accrue under RICO until damages become clear and definite. Id. Courts dismiss RICO claims at the pleading stage where the alleged injury is not presently ascertainable or rests on conjecture. *Lincoln House*, 903 F.2d at 847.

Moreover, RICO does not provide a remedy for personal injuries, reputational harm, or emotional distress; the statute is limited to injury to "business or property." *Zareas v. Bared-San Martin*, 451 F.3d 12, 16 (1st Cir. 2006). Lost opportunity damages, expectancy interests, and speculative future profits likewise fail to satisfy § 1964(c).

Where fraud-based predicates are alleged, Rule 9(b) applies, requiring that damages be tied to particularized fraudulent conduct. *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 291 (1st Cir. 1987). Conclusory assertions of loss do not satisfy either Rule 8(a) or Rule 9(b).

Accordingly, to state a viable civil RICO claim, Plaintiffs must allege (1) a concrete and present injury to business or property, (2) that is clear and definite rather than speculative, and (3) proximately caused by the alleged racketeering conduct.

**B.    Plaintiffs' Damages Allegations Are Conclusory and Speculative**

The Complaint and RICO Statement allege that Plaintiffs suffered "reduced ownership," "diverted royalties," "historical underpayments," and "ongoing diversion of revenue," and seek treble damages "not less than $3,000,000." These allegations are legally insufficient under controlling RICO precedent. (Doc. 1, ¶¶ 44, 156, 159; id. at Prayer ¶ a)

First, Plaintiffs do not identify specific accounting statements, payors, payment dates, or dollar amounts reflecting actual shortfalls. They do not plead work-by-work calculations showing how the alleged misallocations resulted in concrete financial loss. Instead, they rely on generalized characterizations of injury, precisely the type of speculative pleading rejected in *DeMauro* and *Lincoln House*. See 115 F.3d at 99; 903 F.2d at 847.

Second, Plaintiffs' demand for "not less than $3,000,000" in treble damages is untethered to any pleaded base damages. Section 1964(c) permits trebling only of actual, sustained damages. Without alleging a clear and definite underlying amount, the request for treble damages is purely conjectural. As courts have repeatedly held, RICO damages must be presently ascertainable, not dependent upon future reconciliations or speculative recalculations.

Third, to the extent Plaintiffs reference "administrative and financial burdens" associated with correcting records, such allegations are derivative and unspecified. They do not quantify actual expenditures, identify invoices, or tie specific costs to specific predicate acts. Under *Holmes*, proximate causation must be pleaded with factual specificity. 503 U.S. at 268. Plaintiffs' generalized assertions do not satisfy this requirement.

Fourth, Plaintiffs' references to "millions of dollars in royalties" lack factual amplification sufficient to permit a non-speculative computation. Courts in this Circuit have dismissed RICO claims where damages are not clear and definite and remain contingent on unresolved ownership or accounting disputes. *Lincoln House*, 903 F.2d at 847.

**C.    Plaintiffs Failed to Plead What the Law Requires**

To satisfy § 1964(c), Plaintiffs were required to plead, at a minimum, the specific works at issue, the precise ownership percentages allegedly misallocated, the identity of payors, the dates and amounts of underpayments, and a non-speculative calculation of actual monetary loss attributable to each Defendant's conduct.

They were further required to allege a direct causal chain connecting each alleged predicate act to a defined economic injury. *Holmes*, 503 U.S. at 268. Where, as here, Plaintiffs allege fraud-based predicates, they were also required to satisfy Rule 9(b)'s particularity requirement as to both the misrepresentations and the resulting damages. *Becher*, 829 F.2d at 291.

Instead, Plaintiffs rely on conclusory phrases, "diverted royalties," "historical underpayments," "ongoing diversion", without identifying the underlying accounting data that would render the damages clear and definite. This approach fails to meet the First Circuit's requirement that RICO injury be concrete and presently ascertainable. *DeMauro*, 115 F.3d at 99.

Under controlling precedent, damages that depend upon future recalculation, prospective ownership adjudication, or contingent royalty adjustments are not sufficiently definite to confer RICO standing.

**D.    The Damages Deficiency Warrants Dismissal Under Rule 12(b)(6)**

RICO standing, i.e., injury to business or property, is analyzed under Rule 12(b)(6). Where a complaint fails to plead a clear and definite economic injury, dismissal is appropriate. *Lincoln House*, 903 F.2d at 847. Because Plaintiffs have not pleaded present, concrete, non-speculative damages proximately caused by a RICO violation, their claims fail as a matter of law under 18 U.S.C. § 1964(c). The damages allegations are conclusory, indefinite, and contingent, and therefore insufficient under Rule 8(a), Rule 9(b), and controlling First Circuit precedent.

Accordingly, the RICO claims should be dismissed pursuant to Rule 12(b)(6) for failure to plead cognizable damages.

## VII.  THE COMPLAINT MUST BE DISMISSED FOR FAILURE TO JOIN INDISPENSABLE PARTIES UNDER RULE 19

### A.  Legal Standard Under Rule 19

Federal Rule of Civil Procedure 19(a) requires joinder of a party if, in that person's absence, "the court cannot accord complete relief among existing parties," or if the absent party "claims an interest relating to the subject of the action" and disposing of the action in the person's absence may impair or impede that interest or expose existing parties to inconsistent obligations. Fed. R. Civ. P. 19(a)(1). If joinder is not feasible, the Court must determine under Rule 19(b) whether "in equity and good conscience" the action should proceed or be dismissed.

The First Circuit has held that dismissal is appropriate where the absent party's interest is central to the dispute and the requested relief would directly affect that party's rights. *Picciotto v. Cont'l Cas. Co.*, 512 F.3d 9, 15–16 (1st Cir. 2008). Courts in this District similarly recognize that where claims are grounded in contractual allocations or ownership rights, the contracting or ownership parties are indispensable because their interests would be impaired by adjudication in their absence. *P.R. Med. Emergency Grp., Inc. v. Iglesia Episcopal Puertorriqueña, Inc.*, 321 F.R.D. 475, 478–79 (D.P.R. 2017).

An absent party is indispensable where the relief sought would alter contractual rights, ownership interests, or property allocations reflected in binding agreements. Id. at 479. Courts have further recognized that proceeding without such parties risks prejudicial precedent and inconsistent obligations. Id. (citing *Acton Co. v. Bachman Foods, Inc.*, 668 F.2d 76, 81–82 (1st Cir. 1982)).

These principles apply with equal force in civil RICO actions. Although RICO defendants are often joint tortfeasors, where the RICO theory depends upon contractual ownership allocations or property rights that belong in part to absent third parties, those third parties must be joined if the requested remedy would impair their interests.

## B.    The Requested Relief Would Directly Affect Absent Co-Authors and Claimant Entities

The Complaint and RICO Statement seek to "restore" ownership percentages and correct authorship and claimant records for numerous musical compositions. Plaintiffs allege that certain publishing interests were fraudulently allocated and request relief that would effectively revert those interests and require correction of registrations and industry records.

However, the split sheets, BTSA, and final purchase documents reflect that ownership percentages were allocated among multiple co-authors and publishing entities.  Any judicial reallocation of those percentages would necessarily diminish or modify the interests of the other authors reflected in the split agreements.

Rule 19(a) is directly implicated because complete relief cannot be accorded among the existing parties without altering the rights of absent co-authors. See *Picciotto*, 512 F.3d at 15–16. If the Court were to declare that certain percentages were invalid and must be reallocated to Ayala, that declaration would immediately and materially affect the shares of other authors who are not parties to this action.

Additionally, Prendi Publishing Trust d/b/a Gasolina Publishing Co. is identified in the copyright registrations as the claimant entity to which the disputed interests were transferred. This entity transferred its rights to Concord. As the entity of record holding copyright claimant status, Concord possesses a direct property interest in the registrations Plaintiffs seek to modify. Any order requiring amended Copyright Office filings would directly impair that entity's rights.

Under *P.R. Med. Emergency Group*, such ownership-based interests are precisely the type of protectable interests that render a party indispensable. 321 F.R.D. at 478–79.

Moreover, Ayala is not even the owner of the rights at present. As per the BTSA referred to earlier, these rights were transferred to Prendi, which ultimately transferred the rights to Concord, which is not part of these proceedings either. See Exhs. 2 to 5.  In that sense, Ayala lacks standing to sue to redeem the rights alleged in the RICO claim.

## C.    Adjudicating the RICO Claims Without These Parties Would Impair Their Interests and Create Inconsistent Obligations

The relief sought by Plaintiffs includes correction of authorship and publishing allocations in official records and with performance rights organizations. Such relief would require re-registration or amendment of copyright claims, altering the distribution of royalties and ownership percentages.

Proceeding in the absence of the affected co-authors and claimant entities would impair their contractual and statutory rights. Rule 19(a)(1)(B)(i) expressly protects absent parties from having their interests impaired in such circumstances.

Moreover, the risk of inconsistent obligations is substantial. If this Court reallocates ownership percentages without the participation of the other authors or claimant entities, subsequent litigation could produce conflicting determinations concerning the same splits and registrations. The First Circuit has emphasized that avoiding inconsistent obligations is a core purpose of Rule 19. *Acton*, 668 F.2d at 81–82.

Because the RICO claims hinge on alleged "fraudulent" transfers of ownership, and because those transfers involve multi-party split agreements and registrations, the absent co-authors and claimant entities are not peripheral actors they are central rights holders whose interests would be directly adjudicated.

**D.    Dismissal Is Required Under Rule 19(b)**

Where indispensable parties cannot be joined, dismissal is appropriate. Picciotto, 512 F.3d at 16. Here, Plaintiffs have not joined the other co-authors whose shares would be altered, nor have they joined the claimant entity in whose name the registrations stand. Because Concord is not a party to this action, dismissal is appropriate. In equity and good conscience, this action cannot proceed without those parties. The prejudice to absent rights holders is substantial, the risk of inconsistent obligations is real, and the relief sought cannot be tailored in a way that avoids affecting their ownership interests.

Under controlling Rule 19 precedent, and consistent with this District's application of the indispensable-party doctrine in ownership-based disputes, the Complaint must be dismissed unless and until Plaintiffs join all co-authors and claimant entities whose interests would be altered by the requested relief.

**WHEREFORE,** for the stated reasons, Defendant Mireddys González requests the dismissal of the entire RICO complaint with prejudice under Rule 12(b)(6), including any further relief as the Court deems just and proper.

**RESPECTFULLY SUBMITTED,**

In San Juan, Puerto Rico, on February 23, 2026.

I HEREBY CERTIFY that on this same date, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

s/ROBERTO SUEIRO DEL VALLE
USDC No 207801
Tulipán 170, Urb. San Francisco
San Juan, PR 00927-6204
Tel.: 787-753-4712
E-MAIL: rsdv@me.com