UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

LOS CANGRIS, INC. et al.

    Plaintiffs

    v.

RAFAEL A. PINA-NIEVES, et al.

    Defendants

CIVIL NO.   25-01650 (GMM)

MOTION TO DISMISS AMENDED COMPLAINT UNDER FED. R. CIV. P. 12(b)(6)

TO THE HONORABLE COURT:

COME NOW defendants Rafael A. Pina-Nieves ("Pina-Nieves"), World Music Latino

Corp., Los Magnifikos Inc., and Mafer Music Publishing Inc. (collectively, "Appearing

Defendants"), through the undersigned counsel, and respectfully state and pray as follows:

INTRODUCTION

Because RICO is a statute prone to misuse, the First Circuit Court of Appeals

admonishes that:

> [I]n cases alleging civil RICO violations, particular care is required to balance the
> liberality of the Civil Rules with the necessity of preventing abusive or vexatious
> treatment of defendants. . . . Civil RICO is an unusually potent weapon—the
> litigation equivalent of a thermonuclear device. The very pendency of a RICO suit
> can be stigmatizing and its consummation can be costly; a prevailing plaintiff, for
> example, stands to receive treble damages and attorneys' fees. . . . For these reasons,
> it would be unjust if a RICO plaintiff could defeat a motion to dismiss simply by
> asserting an inequity attributable to a defendant's conduct and tacking on the self-
> serving conclusion that the conduct amounted to racketeering.

*Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991) Selya (citing *Figueroa Ruiz*

*v. Alegria*, 896 F.2d 645, 650 (1st Cir. 1990)). For these reasons, courts in this Circuit have

been instructed to "flush out frivolous RICO allegations at an early stage of the litigation." *Figueroa Ruiz*, 896 F.2d at 650.

Despite a 102-page Amended Complaint (Dkt. No. 48), and a 62-page Amended RICO Case Statement (Dkt. No. 49), both prepared under the reasonable-inquiry mandate of Rule 11, Plaintiffs still cannot articulate, a coherent RICO claim against Pina-Nieves, WML, Mafer or Los Magnifikos.

PROCEDURAL BACKGROUND

This case began with the filing of the Complaint on November 29, 2025. (Dkt. No. 1). The Complaint asserted claims under 18 U.S.C. §§ 1962(c), 1962(d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and the Act Against Organized Crime and Money Laundering of the Commonwealth of Puerto Rico ("PROCA").

On December 29, 2025, Defendants filed a joint motion to compel Plaintiffs to file a RICO Case Statement in the form stated therein, to be treated as an extension of the Complaint. (Dkt. No. 20). The Court, on the same day, granted the Motion and ordered Plaintiffs to file a RICO Statement on or before January 23, 2026 (Dkt. No. 21). The Court mandated that the "Statement shall include the facts the Plaintiffs are relying upon to assert the RICO claim as a result of the 'reasonable inquiry' required by Rule 11." Id.

Plaintiffs filed their RICO Statement on January 23, 2026 (Dkt. No. 26). Despite this Court-ordered opportunity to flesh out their claims with specificity, the RICO Statement confirms rather than cures the fatal flaws in Plaintiffs' theory.

Multiple defendants filed motions to dismiss. In response, Plaintiffs filed an Amended Complaint (Dkt. No. 48) and a 62-page Amended RICO Case Statement (Dkt. No. 49). Plaintiffs have now had four opportunities to articulate a viable RICO claim: the

original Complaint, the Court-ordered RICO Case Statement, the Amended Complaint, and the Amended RICO Case Statement. They have failed each time to plead a cognizable civil RICO cause of action.

**STANDARD OF REVIEW**

### A. Rule 12(b)(6): Failure to State a Claim

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court must "accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the pleader's favor." *A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 80 (1st Cir. 2013) (quoting *Santiago v. Puerto Rico*, 655 F.3d 61, 72 (1st Cir. 2011)). A complaint must set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." *Maddox*, 732 F.3d at 80 (quoting Fed. R. Civ. P. 8(a)(2)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Instead, "the complaint must contain 'enough facts to state a claim to relief that is plausible on its face.'" *Maddox*, 732 F.3d at 80 (quoting *Twombly*, 550 U.S. at 570).

Although the pleadings should generally be construed liberally, a greater level of specificity is required in RICO cases. *Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 443 (1st Cir. 2000), amended on denial of reh'g (Dec. 15, 2000).

Although review under Rule 12(b)(6) is generally confined to the four corners of the complaint, courts may consider matters that are susceptible to judicial notice. *Rodi v. S. New England Sch. Of L.*, 389 F.3d 5, 12 (1st Cir. 2004); *Colonial Mortg. Bankers*, 324 F.3d at 15–16; *Boateng v. InterAmerican Univ.*, 210 F.3d 56, 60 (1st Cir.2000). It may also

properly consider documents incorporated by reference, matters of public record, and judicially noticeable adjudications without converting the motion to one for summary judgment. *Trans-Spec Truck Serv. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008); *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 16–17 (1st Cir. 1998). This exception includes documents the authenticity of which are not disputed by the parties; documents central to plaintiffs' claim; or documents sufficiently referred to in the complaint. *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993); see *Hughes v. Baystate Fin. Servs., LLC,* No. 23-CV-10361-AK, 2024 WL 1466611, at *2 (D. Mass. Mar. 31, 2024) (The Court considers an email submitted by Defendant IAFF-FC as Exhibit A to its memorandum in support of its motion to dismiss [Dkt. 27-1], a document which has been "sufficiently referred to in the complaint" and whose authenticity is not in dispute.)

Courts employ a two-step inquiry to resolve Rule 12(b)(6) motions. *Cardigan Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 84 (1st Cir. 2015). First, the Court must "isolate and ignore statements in the complaint that simply offer legal labels and conclusions." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012). Second, it must "take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." *Id.* (quotation modified).

Plausibility requires "something more than merely possible or merely consistent with a defendant's liability." *Germanowski v. Harris*, 854 F.3d 68, 71–72 (1st Cir. 2017) (quotation modified). "To cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability." *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 44–45 (1st Cir. 2012) (citing *Iqbal*, 556 U.S. at 678). "Conducting

4

a plausibility inquiry is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id*. (quoting *Iqbal*, 556 U.S. at 679).

### B. Fraud must be alleged with particularity

Where, as here, the alleged predicates are mail and wire fraud, Fed. R. Civ. 9(b) applies with full force. *Ahmed v. Rosenblatt*, 118 F.3d 886, 889 (1st Cir. 1997). The rule reads:

> In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

Fed. R. Civ. P. 9(b). To comply with the rule's requirements Plaintiffs must specify the "time, place, and content" of each alleged misrepresentation, identify who made it, to whom it was directed, and explain why it was fraudulent. *Id*.; *Feinstein*, 942 F.2d at 42. "[W]here multiple defendants are involved, Rule 9(b) requires that fraud be alleged particularly as to each defendant." *Krick v. Raytheon Co*., 695 F. Supp. 3d 202, 216 (D. Mass. 2023). Sweeping references to the collective fraudulent actions of multiple defendants will not satisfy the particularity requirements. *Naughright v. Weiss*, 826 F. Supp. 2d 676, 689 (S.D.N.Y. 2011).

Civil RICO claims are subject to "uniquely stringent pleading standards." *MCDP Phoenix Servs*., 2023 WL 2652644, at *3.

ARGUMENT

### A. The pleadings do not meet the standards for Civil RICO

Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs

through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c) The term "enterprise" is defined as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C § 1961(4). It is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. *United States v. Turkette*, 452 U.S. 576, 583 (1981).

An enterprise may be a legal entity like a business, a governmental unit, or a union, or it may be an informal grouping of individuals associated in fact. *United States v. Turkette*, 452 U.S. 576, 580–81 (1981). However, the enterprise itself cannot be the RICO defendant. See *Odishelidze v. Aetna Life & Casualty Co.*, 853 F.2d 21, 23 (1st Cir. 1988) (per curiam) ("The 'person' alleged to be engaged in a racketeering activity (the defendant, that is) must be an entity distinct from the 'enterprise.'"). The defendant must participate in the "operation or management of the enterprise itself," meaning he must "have some part in directing [the enterprise's] affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). The person must be "employed by or associated with" the RICO enterprise, but the same entity cannot do double duty as both the RICO defendant and the RICO enterprise. *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991)

To establish an association-in-fact enterprise, plaintiffs must demonstrate "three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States,* 556 U.S. 938, 946 (2009). To determine whether a group of individuals or entities constitutes an association-in-fact within the meaning of the RICO statute, courts analyze the "hierarchy, organization, and activities" of the alleged association to determine

whether "its members functioned as a unit." *First Capital Asset Mgmt. v. Satinwood, Inc.,* 385 F.3d 159, 174–75 (2d Cir. 2004). For there to be an enterprise its members must share a "common purpose." *United States v. Cianci*, 378 F.3d 71, 82 (1st Cir. 2004); *Ryan v. Clemente,* 901 F.2d 177, 180 (1st Cir.1990) ("it is very clear that those who are 'associates' ... of a criminal enterprise must share a 'common purpose' ...."). The concept of association requires both interpersonal relationships and a common interest. *Boyle*, 556 U.S. at 946.

To state a claim under 18 U.S.C. § 1962(c), a plaintiff must plausibly allege that a defendant (1) conducted or participated in the conduct of an enterprise's affairs (2) through a pattern (3) of racketeering activity, consisting of at least two actionable predicate acts, and (4) that such racketeering proximately caused a concrete injury to the plaintiff's business or property. *Sedima, S.P.R.L. v. Imrex Co*., 473 U.S. 479, 496 (1985); *Reves*, 507 U.S. at  179; *Feinstein v. Resolution Tr. Corp*., 942 F.2d 34, 41–42 (1st Cir. 1991); *Doyle v. Hasbro, Inc*., 103 F.3d 186, 190 (1st Cir. 1996).

The Supreme Court has repeatedly emphasized that the enterprise must have an existence "separate and apart" from the pattern of racketeering activity.  *Turkette*, 452 U.S. at 583 (1981). The existence of an enterprise at all times remains a separate element which must be proved. *Id.* "If the sole purpose of the alleged enterprise is to perpetrate the alleged fraud, there can be no enterprise for RICO purposes." *Goldfine v. Sichenzia*, 118 F. Supp. 2d 392, 401 (S.D.N.Y. 2000). See also *Stephens, Inc. v. Geldermann, Inc.*, 962 F.2d 808, 815–16 (8th Cir. 1992) (The only common factor that linked all these parties together and defined them as a distinct group was their direct or indirect participation in Markle's scheme to defraud Stephens.)

### 1. Plaintiffs have failed to adequately plead an enterprise.

In the original RICO Case Statement plaintiffs failed to distinguish the racketeering activity from the usual and daily activities of the enterprise, a necessary distinction under *Turkette* above. In response to Question 8 asking how the racketeering activity differed from the usual and daily activities of the enterprise, Plaintiffs stated:

> The enterprise's day-to-day operations consisted of carrying out the predicate acts alleged. The enterprise functioned as a vehicle for fraud and extortion. The pattern of racketeering activity wire fraud and extortion, was not an occasional deviation from normal business practices but **the enterprise's regular way of doing business**.

Dkt. No. 26, RICO Statement at 50–51 (emphasis added). That admission merged the alleged enterprise and the pattern of racketeering activity. Plaintiffs have now attempted to rewrite that answer. Dkt. No. 49 at 50–51. But this revision is a transparent, litigation-driven retraction, not a cure. The underlying theory remains unchanged, and the defect persists.

The Amended Complaint and Amended RICO Case Statement now add purported "legitimate" activities such as registering songs with the Copyright Office, organizing concerts, handling travel, and coordinating video shoots. Dkt. No. 49 at 50. But every one of these functions is the ordinary course of business of El Cartel Records, Los Cangris, or WML/Pina Records, entities pre-existing the alleged "enterprise", independently incorporated entities with their own legal identities. Those are activities each carried out on their own, not as an enterprise comprised of all of them. They are not activities of any distinct association-in-fact enterprise. Pursuant to this, the alleged enterprise appears entirely defined by the alleged racketeering acts. The enterprise is nothing more than defendants carrying out the alleged fraudulent allocations.

8

The inquiry is the one this Court mandated in *Boyd v. López-Vidal*, Civil No. 22-1190 (GMM), Op. at 16 (D.P.R. March 18, 2026): "we must determine if the enterprise would still exist were the predicate acts removed from the equation." Here, as in *Boyd*, the answer is no. Remove the predicate acts and what remains is individual companies conducting their own business through their own corporate structures. Although it is true that each member of this group carried on other legitimate activities, these activities were not in furtherance of the common or shared purpose of the enterprise and, thus, were not acts of the enterprise.

Since the legitimate activities are not enterprise related, what we have here is not a RICO enterprise, it is the racketeering itself. As courts have consistently held, "[i]f the sole purpose of the alleged enterprise is to perpetrate the alleged fraud, there can be no enterprise for RICO purposes." *Goldfine v. Sichenzia*, 118 F. Supp. 2d 392, 401 (S.D.N.Y. 2000).

The amendment also introduces irreconcilable inconsistencies. The Amended RICO Case Statement asserts that the enterprise's legitimate activities were conducted "with Ayala-Rodríguez's knowledge and consent." Dkt. No. 49 at 50. Yet the Amended Complaint alleges the opposite that González-Castellanos "excluded Ayala-Rodríguez from all the e-mail communications" and did so "purposefully to avoid [his] awareness." Dkt. No. 48, ¶ 32.

These are not minor discrepancies; they are mutually exclusive factual theories. Under *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009), courts need not accept internally contradictory allegations as true. This Court has already recognized that such

9

contradictions "undermine the plausibility of a coherent RICO enterprise or common unlawful purpose." *Boyd*, Op. at 17–18.

Plaintiffs cannot plead around their own prior admissions. The First Circuit has squarely held that statements in a superseded complaint remain admissible as party admissions and may be considered in evaluating the plausibility of amended allegations. *InterGen N.V. v. Grina*, 344 F.3d 134, 144–45 (1st Cir. 2003). As a matter of pleading, the original complaint has disappeared; as an admission against interest, it has not. *Wiseman v. Reposa*, 463 F.2d 226, 227 (1st Cir. 1972). That principle is dispositive here. Plaintiffs' original formulation expressly equating the enterprise with the predicate acts remains in the record and confirms what the Amended Complaint attempts to obscure: there is no independent factual basis for a distinct RICO enterprise or for any alleged "financial advantages" derived by González-Castellanos from a separate enterprise structure.

Nor does redrafting cure the problem. The original RICO Case Statement (Dkt. No. 26) is a party-opponent admission under Fed. R. Evid. 801(d)(2), and it cannot be nullified through revision. If anything, Plaintiffs' effort to rewrite that answer underscores their recognition that the original allegation was fatal. But the failure of the amendment to articulate a coherent enterprise distinct from the alleged racketeering activity confirms that the defect is structural, not semantic.

In sum, the amendment does not salvage Plaintiffs' RICO theory. It instead reinforces that Plaintiffs cannot plead because they cannot allege a RICO enterprise separate from the purported predicate acts. Dismissal is therefore required as a matter of law.

## 2. The Complaint fails to adequately plead González-Castellanos' role in the enterprise

Plaintiffs' enterprise theory suffers from another fundamental pleading defect that the amendment has not cured, it has exposed it.

The Amended Complaint continues to rely on the same conclusory premise: that González-Castellanos Ayala-Rodríguez's then-wife, president, and co-owner of plaintiff Los Cangris—knowingly participated in a scheme that siphoned value away from the very corporation she led. That theory is facially implausible. It asks the Court to accept that a corporate fiduciary deliberately diminished her own company's core revenue-generating asset without any concrete, non-conclusory explanation of how or why doing so would benefit her. Absent well-pleaded allegations of personal gain, such conduct is economically irrational and cannot support a plausible inference of wrongdoing.

The sole allegation offered to bridge that gap underscores the defect:

¶109(b)(iii) To provide the administrative backbone of the fraudulent schemes by preparing and transmitting false split sheets and publishing allocations, González-Castellanos ensured concealment of misappropriation and preserved her position and financial advantages tied to the enterprise's success.

Dkt. No. 48.

This is precisely the type of "threadbare recital[] of the elements of a cause of action" that *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), forbids. It asserts a motive, "financial advantages tied to the enterprise's success," but pleads no facts identifying what those advantages were, how they were obtained, or why they would outweigh the harm to the corporation she controlled.

11

The deficiency becomes even more apparent when compared to the original Complaint. There, Plaintiffs advanced the same theory but expressly qualified it "upon information and belief":

> ¶109(c) … González-Castellanos ensured concealment of misappropriation and, upon information and belief, preserved her position and financial advantages tied to the enterprise's success.

Dkt. No. 1 ¶190(c).

Plaintiffs have now simply deleted the phrase "upon information and belief" without adding a single supporting fact. That revision does not cure the defect, it confirms it. The First Circuit has long held that allegations based on "information and belief" are insufficient unless supported by underlying facts. *Wayne Inv., Inc. v. Gulf Oil Corp.*, 739 F.2d 11, 13 (1st Cir. 1984). Plaintiffs' original pleading failed that standard; their amendment does not attempt to meet it. Instead, it strips away the qualifier while leaving the factual vacuum untouched an implicit admission that no factual basis exists.

That maneuver is legally ineffective. A plaintiff cannot transform a deficient allegation into a plausible one through cosmetic revision. Rule 8 and Rule 9(b) require facts, not labels.

Nor can Plaintiffs avoid the consequences of their prior pleading. As mentioned in the previous section, statements in a superseded complaint remain admissible as party admissions and may be considered in evaluating the plausibility of amended allegations. Plaintiffs' original formulation expressly grounded in "information and belief" undermines the credibility and plausibility of the amended version, confirming that the allegation of "financial advantages" is speculative, not factual.

That absence is fatal. Where a claim depends on the premise that a corporate fiduciary acted against her own company's economic interests, courts require concrete

12

allegations explaining the purported personal benefit such as side payments, undisclosed compensation, equity interests, or other mechanisms of gain. None are alleged here. Plaintiffs offer only a conclusory label untethered to any factual content. Under *Iqbal* and First Circuit precedent, that is insufficient. See also *Rodi v. Southern New England School of Law*, 389 F.3d 5, 13–14 (1st Cir. 2004).

This failure also defeats Plaintiffs' attempt to plead an association-in-fact enterprise. Plaintiffs do not allege, with any specificity, that González-Castellanos and Pina—the purported leader of the enterprise—reached any agreement or functioned as a coordinated unit with a shared unlawful purpose. The Complaint is devoid of factual allegations describing the mechanics of their interactions, any common financial objective, or any structure through which the alleged enterprise operated. That omission is dispositive. See, e.g., *Cont'l Petroleum Corp. v. Corp. Funding Partners, LLC*, No. 11 Civ. 7801, 2012 WL 1231775, at *6 (S.D.N.Y. Apr. 12, 2012); *Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 307 (S.D.N.Y. 2010).

Accordingly, Plaintiffs' failure to plausibly allege González-Castellanos's knowing, self-interested participation is fatal to the enterprise theory as pled. An association-in-fact enterprise requires more than a list of actors; it requires well-pleaded facts showing a shared unlawful purpose, coordinated relationships, and a functioning unit with structural coherence. Those elements are absent.

Absent plausible allegations that she aligned herself with the alleged racketeering objective for personal gain, the supposed "enterprise" collapses. Without her participation as part of a continuing unit, Plaintiffs cannot establish the common purpose or coordinated structure required under § 1962(c).

What remains is not a RICO enterprise, but at most a domestic corporate dispute, an attack on business decisions by González-Castellanos that Plaintiffs now attempt to recast as racketeering. That is not enough to state a RICO claim.

### 3.  Plaintiffs fail to adequately plead proximate cause

Plaintiffs' causation theory depends on a multi-link chain: (1) defendants send emails to PROs and publishers; (2) PROs update their databases; (3) royalty-paying entities pay based on those databases; (4) Plaintiffs receive less. That chain runs through ASCAP, BMI, Sony Music Publishing, the U.S. Copyright Office, and other independent third parties whose institutional function is to verify and administer ownership claims.

The Amended Complaint and RICO Statement confirm this structure. For example, Plaintiffs allege that Coll-Fernández emailed ASCAP to report a purported 30% publishing share in "Otra Cosa," which ASCAP and "affiliated administrators" then relied upon in "administration and accounting" before any alleged royalty impact occurred.  Similarly, Plaintiffs allege that Pina-Nieves communicated with Sony Music Publishing regarding "El Desorden," after which Sony and other "industry stakeholders" processed and relied on those representations in administering the work.  The same pattern appears with respect to copyright registrations: Plaintiffs allege that filings submitted to the United States Copyright Office were reviewed, registered, and maintained in federal systems, and only then allegedly affected ownership recognition and downstream revenue flows.

Plaintiffs also expressly plead that royalty payments were made by "royalty-paying entities" based on data embedded in PRO and publisher systems, not by Defendants themselves. Indeed, the theory depends on a sequence of independent decisions: emails are sent → PROs and publishers accept and implement splits → databases are updated → third-

party payors distribute royalties accordingly. That is precisely the kind of indirect, intermediary-driven causation chain the Supreme Court has rejected.

This Court held in *Boyd* that the causal link between predicate acts and injury must be direct, and rejected liability where the theory "depends on intervening actors or attenuated inferences." *Boyd*, Op. at 22 (citing *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458-60 (2006)). Allegations that defendants merely "facilitated," "enabled," or 'failed to prevent' misconduct 'are insufficient as a matter of law.' *Boyd*, Op. at 22-23. An injury that depends on the independent actions of regulated third-party intermediaries is precisely the type of attenuated harm that *Boyd*, *Hemi*, and *Anza* reject.

### 4. Plaintiffs Fail to Plausibly Allege That Any Defendant Conduct Reduced a Cognizable Ownership Interest

Plaintiffs' causation theory fails at a more fundamental level: they do not plausibly allege that any challenged conduct reduced a legally cognizable ownership interest held by Ayala-Rodríguez in the first place.

The Amended Complaint repeatedly asserts that Defendants "reduced" Plaintiffs' publishing shares by allocating percentages to Pina-Nieves. But that conclusion assumes—without adequately pleading—that Ayala-Rodríguez possessed a fixed, enforceable ownership interest in each composition that was capable of being diminished. It does not.

Critically, Plaintiffs do not plead non-conclusory facts establishing (i) the original ownership structure of each work, (ii) the contractual or legal basis for Ayala-Rodríguez's claimed percentages, or (iii) that those interests were exclusive and incapable of lawful reallocation among co-authors or contributors. Absent such allegations, there is no

15

plausible basis to infer that any allocation to Pina-Nieves necessarily reduced a protected property interest, as opposed to reflecting a different authorship or contribution structure.

This defect is particularly evident where the pleadings themselves reflect materially different authorship configurations for the same works. The existence of multiple co-writers and varying percentage allocations, none tied to a clearly pleaded, enforceable baseline, undermines any inference that Plaintiffs held a fixed share that was unlawfully "taken."

Without a well-pleaded ownership baseline, Plaintiffs' injury theory fails. They do not allege facts showing that they were entitled to receive a specific percentage of royalties that was then diverted; instead, they assume the very entitlement they must plead. That is insufficient under Twombly and Iqbal.

This failure also breaks the causal chain. If Plaintiffs cannot plausibly allege that their ownership interests were diminished, they cannot show that any alleged misrepresentation to third parties caused them economic harm. At most, the Complaint alleges competing claims of authorship submitted to industry intermediaries—not the deprivation of a concrete property interest.

Accordingly, Plaintiffs fail to plead both injury and proximate causation as a matter of law.

### 5. Plaintiffs fail to Plead Cognizable Predicate Acts of Racketeering activity.

"Racketeering activity" is defined to include a variety of federal crimes, including, among other things, threats, bribery, extortion, embezzlement, theft, wire fraud, and mail fraud. 18 U.S.C. § 1961. The pattern of racketeering activity is a series of criminal acts as defined by the statute. 18 U.S.C. § 1961(1). It is proved by evidence of the requisite number

16

of acts of racketeering committed by the participants in the enterprise. By statute, the "pattern" element requires a plaintiff to show at least two predicate acts of "racketeering activity," which is defined to include violations of specified federal laws, such as the mail and wire fraud statutes, see 18 U.S.C. § 1961(1)(B), (5). Although showing two predicate acts is the only statutory requirement, case law establishes that this is not sufficient to prove a "pattern"—the plaintiff also must demonstrate that the "predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989); *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 15 (1st Cir. 2000).

Plaintiffs allege that the defendants have committed wire fraud in violation of 18 U.S.C. § 1343. Wire fraud is defined under 18 U.S.C. § 1343, in pertinent part, as:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. […]

To prove wire fraud, a plaintiff must demonstrate: "(1) a scheme [or artifice] to defraud by means of false pretenses; (2) the defendant's knowing and willing participation in the scheme with the intent to defraud; and (3) the use of interstate wire or mail communications in furtherance of the scheme." *United States v. Martin*, 228 F.3d 1, 15 (1st Cir. 2000).

To satisfy the "in furtherance" element of a mail fraud claim, "the mailings need not be an 'essential element' of the scheme." *United States v. Hebshie,* 549 F.3d 30, 36 (1st Cir.2008) (quoting *Pereira v. United States,* 347 U.S. 1, 8 (1954)). Rather, the mailings "must be sufficiently closely related to the scheme such that they are incident to an essential

part of the scheme, or a step in the plot." *Id.* (quotations and alteration omitted). Although a "but-for" link between a mailing and the fraudulent scheme is not necessary, *Id.,* "the success of the scheme must be dependent in some way on the mailings, either in obtaining the desired object or in avoiding or delaying detection of the scheme." *United States v. Greenleaf,* 692 F.2d 182, 186 (1st Cir.1982); *see United States v. Pacheco–Ortiz,* 889 F.2d 301, 305 (1st Cir.1989) ("[T]he scheme's completion or the prevention of its detection must have depended in some way on the mailings.").

The First Circuit recently underscored these principles in *Humana Inc. v. Biogen, Inc.*, 126 F.4th 94, 107 (1st Cir. 2025), affirming dismissal of a civil RICO claim where the plaintiff failed to plead with specificity who made the alleged misrepresentations, to whom they were made, when and where they were made, what they contained, and why they were fraudulent.

Closer to home, Chief Judge Arias-Marxuach of this District dismissed RICO claims with prejudice in *Puerto Rico Soccer League NFP Corp. v. Federación Puertorriqueña de Futbol*, Civil No. 23-1203 (RAM) 2024 WL 4362339 (D.P.R. Sept. 30, 2024), where plaintiffs similarly failed to plead cognizable RICO claims with the requisite specificity. That decision reflects the settled principle that courts must "flush out frivolous RICO allegations at an early stage of the litigation." *Figueroa Ruiz*, 896 F.2d at 650.

**(i)    The predicate acts antedating the enterprise must be discarded**

The Amended Complaint claims the RICO enterprise began in 2015 and spanned for nearly a decade into 2025. Dkt. No. 48, Amended Complaint ¶3. The Amended Complaint, however, alleges predicate acts occurring between 2004 and 2005. See Dkt.

18

No. 48, Complaint ¶¶ 65–69. Those allegations predate the purported creation of the enterprise by more than a decade.

The RICO claim under Section 1962(c) makes it unlawful to conduct or participate in the "conduct of the affairs of an enterprise" through a pattern of racketeering activity. 18 U.S.C. § 1962(c). This language necessarily requires that the enterprise exist at the time the predicate acts are committed. See *Boyle v. United States*, 556 U.S. 938, 946 (2009) (enterprise must have "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose"). Plaintiffs cannot have it both ways. If the enterprise formed in 2015, then acts in 2004– 2005 cannot be RICO predicates because they were not undertaken through the affairs of that enterprise. Conversely, if Plaintiffs contend that the enterprise existed as early as 2004, they must plausibly allege that the same association-in-fact—with the same structure, participants, and common purpose—persisted continuously through 2025. See id. The Amended Complaint does not come close to doing so. To the contrary, it fails to allege that key purported members even knew each other at that time, much less that they were functioning as a coordinated unit.

Even setting aside this temporal defect, the 2004–2005 allegations fail for an independent reason: Plaintiffs do not plausibly allege that those acts were conducted through the affairs of any enterprise at all. Section 1962(c) reaches only conduct undertaken in the operation or management of an enterprise, not isolated or personal acts. See *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). Here, the alleged extortion is pleaded as individualized conduct by Pina, untethered to any enterprise structure, decision-making framework, or coordinated activity involving other defendants. There are no factual

19

allegations that any association-in-fact existed at that time, that other alleged members participated in or directed the conduct, or that the acts were undertaken in furtherance of any shared enterprise purpose. This failure alone is fatal to treating those acts as RICO predicates.

Relatedness is absent. Predicate acts must be related in purpose, results, participants, victims, and methods. See *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 240 (1989). The alleged 2004–2005 extortion involves threats of physical harm directed at Juan Ortiz-García in connection with album distribution, whereas the 2015–2025 allegations concern purported misrepresentations in publishing rights, royalty allocations, and copyright registrations directed at Ayala-Rodríguez. These allegations differ in every relevant respect (purpose, victim, method, and context), and therefore cannot be aggregated into a single RICO pattern.

Moreover, the 2004–2005 allegations cannot support Plaintiffs' RICO claim because they did not cause any injury to Plaintiffs' business or property. Civil RICO requires that a plaintiff be injured "by reason of" the alleged predicate acts. 18 U.S.C. § 1964(c). Here, the alleged victim of the 2004–2005 conduct is a third party, not Plaintiffs. The Amended Complaint does not—and cannot—allege that Plaintiffs suffered any concrete financial loss as a result of those acts.

Finally, those allegations are independently barred by the statute of limitations. Civil RICO claims carry a four-year limitations period that begins when the plaintiff discovers, or should have discovered, the injury. See *Agency Holding Corp. v. Malley-Duff & Assocs.*, 483 U.S. 143, 156 (1987); *Rotella v. Wood*, 528 U.S. 549, 553–55 (2000). Any claim based on alleged acts in 2004–2005 accrued, at the latest, at that time and cannot be

20

revived by later, unrelated conduct. The First Circuit has expressly rejected any "last predicate act" rule that would allow stale claims to be resurrected. See *Lares Grp., II v. Tobin*, 221 F.3d 41, 44–45 (1st Cir. 2000). Accordingly, the 2004–2005 allegations are not only irrelevant to the alleged enterprise—they are legally non-actionable and must be disregarded.

**(ii)    The predicate acts based on communications to and from an ASCAP representative or to independent publishers cannot constitute fraudulent concealment.**

The bulk of the alleged predicate acts identified in the Complaint consist of routine email communications with industry representatives—most prominently Rivera-Pagán at ASCAP and Rodríguez at Sony Publishing—regarding publishing splits, songwriter percentages, and catalog information. See Dkt. No. 1, Complaint ¶¶ 71.

These are not secret transmissions between co-conspirators designed to conceal wrongdoing; they are communications directed to third-party entities whose institutional role is to receive, verify, administer, and, where appropriate, question authorship and publishing claims. ASCAP and Sony are not passive bystanders. They are sophisticated, regulated industry participants responsible for tracking ownership data and ensuring the accuracy of royalty distributions. Communications with such entities necessarily increase the number of individuals and systems exposed to the allegedly false information. By definition, that expands—not restricts—the risk of scrutiny.

The Supreme Court has made clear that a mailing or wire transmission does not satisfy the mail or wire fraud statutes unless it is "for the purpose of executing" the scheme. In *United States v. Maze*, 414 U.S. 395, 403 (1974), the Court held that mailings which "increased the probability that [the defendant] would be detected and apprehended" were

21

not in furtherance of the scheme. The Second Circuit applied the same reasoning in *Lundy v. Catholic Health System of Long Island Inc.*, 711 F.3d 106, 119–20 (2d Cir. 2013), affirming dismissal of a RICO claim where the alleged mailings—pay stubs—would have revealed, not concealed, the supposed underpayment. Likewise, in *Cavallaro v. UMass Memorial Health Care Inc.*, No. 09–40152, 2010 WL 3609535, at *2–3 (D. Mass. July 2, 2010), the court rejected a mail fraud theory because the mailing of paychecks that allegedly omitted compensation would have made discovery of the discrepancy more likely, not less. As that court explained, if the documents were inaccurate as alleged, they did not further the fraud—they exposed it.

The same structural defect exists here. Emails to ASCAP, Sony Publishing and others in the industry, documenting publishing splits are, by their nature, traceable business records sent to independent entities that maintain databases, audit shares, and communicate with multiple rights holders. They create written trails. They generate confirmations. They are stored in institutional systems beyond defendants' control. If the allocations were unauthorized, those communications would create precisely the type of documentary footprint that enables detection by co-writers, administrators, auditors, and future catalog purchasers. Under *Maze, Lundy*, and *Cavallaro*, communications that expand the audience of the allegedly false information and embed it in third-party compliance systems cannot plausibly be characterized as wires "in furtherance" of a concealment-based fraud theory.

In short, the Complaint attempts to transform ordinary industry correspondence into racketeering predicates. But where the alleged wires consist of transparent communications to royalty administrators—entities whose function is to scrutinize and process ownership claims—the law does not permit them to be recast as instruments of concealment. As the

Supreme Court made clear, a transmission that increases the probability of detection is not one that executes the scheme.

A close examination of a typical alleged predicate act involving ASCAP representative Roberto Rivera Pagan illustrates this point. Plaintiffs allege:

> On or about January 11, 2017, at approximately 4:01 p.m., Coll-Fernández, using his WML email account, knowingly and intentionally transmitted an email by means of wire communication in interstate and foreign commerce to Roberto Rivera-Pagán ("Rivera-Pagán"), a representative of the American Society of Composers, Authors, and Publishers ("ASCAP"), in which Coll-Fernández and WML falsely represented that Pina-Nieves and his publishing company, Mafer, held a thirty percent (30%) publishing share in the musical composition "Otra Cosa," exceeding Plaintiffs' twenty-five percent (25%) share, and falsely created the appearance that Ayala-Rodríguez had approved that allocation; Coll-Fernández did not copy or otherwise notify Ayala-Rodríguez of this communication, and at no time did Ayala-Rodríguez consent to any assignment, reallocation, or encumbrance of his publishing share, nor is there any written instrument of conveyance of such rights executed by Ayala-Rodríguez.

Dkt. No. 48, ¶71.

Let's see how this specifically flows. First, Coll emails [rrivera@ascap.com](mailto:rrivera@ascap.com) informing the splits:

From: **Andres Coll** andrescoll@pinarecords.net
Subject: splits Otra Cosa
Date: January 11, 2017 at 4:01 PM
To: rrivera@ascap.com

Egbert E. Rosa "Haze" / Sony/ATV Latin Music Publishing LLC (BMI) / 15%
Rafael Pina / Mafer Music Publishing (ASCAP) Administered by Sony/ATV Latin Music Publishing LLC / 30%
Ramón L. Ayala "Daddy Yankee" / Los Cangris Publishing (ASCAP) / 25%
Natalia Gutiérrez "Natti" / adm by Mafer Music Publishing (ASCAP)/ 15%
Jesús M. Nieves Cortés / A Million Dollar Dream (ASCAP) /15%

(Rule 12(b)(6) admissible as a document referenced to in the Complaint).

The information provided by Coll to ASCAP, ends up in ASCAP's databases:



(Rule 12(b)(6) admissible by judicial notice).

Anyone, as counsel did here, can access the database, search for "Otra Cosa" and see Rafael A. Pina Nieves listed as a "writer" together with Ayala and others. Coll could not plausibly have believed that communicating with ASCAP would keep the information hidden. If anything, transmitting the information to ASCAP ensured that the allocation would be recorded in a centralized, reviewable (i.e. public) system. Fraudulent concealment typically involves bypassing oversight, avoiding institutional recordkeeping, or falsifying internal documents. This communication did the opposite—it submitted the allocation to an independent entity whose business model is transparency and royalty accounting.

The January 11, 2017, email is even further removed from the realm of wire fraud when one considers that it does not operate in a vacuum. The split notification for "Otra

Cosa" lists five separate writers/publishers. Each of those writers and/or their publishing administrators has independent economic incentive to monitor ASCAP's repertory database. This is not a unilateral allocation affecting a single silent counterparty. It is a multi-party split where four other separate rights holders—each with their own publishers, administrators, and royalty streams—would predictably review and confirm the database entries.

Because the emails to industry professional and entities do not conceal, but on the contrary publicize the splits, those emails are not fraudulent concealment and cannot form the basis for a RICO predicate act.

Finally, the alleged communications to PROs do not establish proximate causation under RICO. Any purported injury—i.e., reduced royalty payments—would be the result of independent decisions by third-party PROs applying their own distribution methodologies, not the direct consequence of any alleged misrepresentation by Defendants. This intervening layer of discretion breaks the causal chain required under § 1964(c). Plaintiffs' theory improperly assumes a straight-line relationship between alleged submissions and alleged losses, but fails to account for the independent, discretionary role of PROs in allocating royalties. As such, the alleged conduct is too attenuated to satisfy RICO's proximate cause requirement.

**(iii)** <u>**Predicate acts that did not involve the use of electronic mail do not qualify as wire fraud under RICO**</u>

One of the predicate acts fails to specify a single act of wire fraud. On paragraph 86 of the Amended Complaint, Plaintiffs allege:

> 86.    In or about 2020, Pina-Nieves, acting with intent to defraud, falsely listed himself as the producer of the 2K20 Live album, even though he did not produce the album and had served only as the producer of the live show. His false producer credit was submitted and disseminated through interstate and foreign wire

communications, including the electronic transmission of album metadata, credit information, and production details to digital distributors, streaming platforms, and royalty-processing systems. This misrepresentation was made as part of the broader scheme and artifice to defraud devised and executed by Pina-Nieves, with the purpose of obtaining money and property—specifically, producer credit, royalties, backend income, and financial benefits associated with the 2K20 Live album. The representation was materially false, and Pina-Nieves deliberately concealed the truth with the intent to deceive and divert revenue. Ayala-Rodríguez never consented to Pina-Nieves being identified or compensated as the album's producer. The use of interstate wire communications was both reasonably foreseeable and integral to the execution of the fraudulent scheme. After Defendants transmitted the false producer information electronically, the album and its metadata were ingested and distributed across internet-based music platforms, including Apple Music, which rely on interstate and foreign wire transmissions. The 2K20 Live album appears on Apple Music, where it is streamed and downloaded by users throughout the United States and internationally. Each stream or download results in the interstate electronic transmission of the album's audio files and metadata—metadata that contains the false producer credit assigned to Pina-Nieves. These transmissions necessarily occur over the internet, which operates as a system of interstate and foreign wire communications. It was reasonably foreseeable to Pina-Nieves that the album would be commercially released online; that the songs would be streamed, downloaded, and monetized through interstate digital networks; that royalty statements and producer-related payments would be processed through internet-based wire transfers; and that digital distributors would repeatedly transmit metadata containing the false producer credit to third parties across state lines. Pina-Nieves' knowing misrepresentations and omissions regarding the production of the 2K20 Live album were used, relied upon, and disseminated throughout the digital music-distribution ecosystem. As a direct and proximate result, Plaintiffs suffered financial harm, including the loss of rightful royalties, the misallocation of production credit, and the diversion of income associated with the album.

Dkt. No. 49, Amended Complaint, ¶ pp.86.

These allegations regarding the 2K20 Live album do not come close to pleading wire fraud with the particularity required by Rule 9(b) and therefore cannot serve as a RICO predicate.

To state wire fraud, Plaintiffs must allege with specificity the "who, what, when, where, and how" of a scheme to defraud, including the content of the alleged misrepresentation, the identity of the speaker, the recipient, and the circumstances under which the statement was made. They do not do so. Instead, paragraph 86 offers a sprawling,

generalized narrative that relies on conclusory assertions and technological inevitabilities, not particularized facts.

First, Plaintiffs fail to identify any specific false transmission. The allegation that Pina-Nieves "submitted and disseminated" false metadata through "interstate and foreign wire communications" is entirely generic. It does not identify a single communication—no date, no specific transmission, no particular platform submission, no identified recipient, and no concrete statement that was false at the time it was made.

Second, Plaintiffs improperly conflate the alleged misrepresentation with downstream, automatic digital processes. The bulk of the paragraph is devoted not to any fraudulent statement by Defendants, but to describing how music is distributed in the modern streaming economy—i.e., that songs are uploaded, metadata is transmitted, and streams generate royalties through interstate networks. But the mere fact that digital platforms use interstate wires does not transform routine distribution into wire fraud. RICO requires that the wires themselves be used in furtherance of a fraudulent scheme—not that they be incidentally involved in ordinary commercial activity.

Third, Plaintiffs fail to plead reliance or causation with the required specificity. They assert, in conclusory fashion, that the alleged misrepresentation was "used, relied upon, and disseminated," but do not identify who relied on it, how any reliance occurred, or how it directly caused Plaintiffs' alleged injury. There is no allegation that any distributor, platform, or counterparty was actually misled in a way that altered payment flows or contractual entitlements. The claim instead rests on the unsupported assumption that any allegedly inaccurate credit automatically resulted in diverted revenue.

27

Fourth, the allegation of fraudulent intent is entirely conclusory. Plaintiffs simply assert that Pina-Nieves acted "with intent to defraud" and "deliberately concealed the truth," without pleading any particular facts supporting scienter. There are no allegations of contemporaneous communications, internal directives, or other indicia of fraudulent intent. Such bare assertions are insufficient under Rule 9(b), especially in the RICO context.

Finally, the theory collapses into an impermissible "fraud by label" claim. Plaintiffs assume that because Pina-Nieves was allegedly not the "producer," any attribution of producer credit is necessarily fraudulent. But they plead no facts establishing what "producer" means in this context, who determines that designation, what contractual or industry standards govern it, or why the designation was objectively false rather than disputed or subjective. Without that foundation, the alleged "misrepresentation" is not plausibly fraudulent.

In sum, paragraph 86 does not plead wire fraud—it describes a business dispute over credits and revenue, dressed in the language of fraud and amplified by references to the internet. That is insufficient. Because Plaintiffs fail to allege any predicate act of wire fraud with the particularity required by Rule 9(b), this claim cannot support a RICO cause of action and must be dismissed.

> **(iv)** **The predicate acts based on "Otra Cosa", "El Desorden" and "No lo Trates" must be discarded because they do not show an injury to property nor adequately plead wire fraud.**

On ¶56 of the Amended Complaint, Plaintiffs state that:

Plaintiffs also learned, upon reviewing the concealed correspondence, that Pina-Nieves engaged in similar manipulation in connection with the 2021 Asset Purchase Agreement ("APA") for the sale of Daddy Yankee's catalog. The only songs at issue in this litigation that appear in the APA are "El Desorden" and "Otra

Cosa." Yet the hidden emails revealed that Pina-Nieves improperly secured a publishing percentage for "El Desorden," even though no such percentage is referenced in the APA, and that he obtained for himself a higher publishing share for "Otra Cosa" than the share reflected in the APA itself.

Dkt. 48. A close examination of the purported "hidden emails" show no injury to property or business.

RICO requires plaintiffs to show that they were "injured in [their] business or property by reason of" the racketeering activity. *Bonilla v. Volvo Car Corp.*, 150 F.3d 62, 66–67 (1st Cir.1998). To avert dismissal under Rule 12(b)(6), civil RICO complaint must state facts showing "a causal nexus between [racketeering activity] and the harm alleged"; the "injury itself" must be "the result of a predicate act." *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44, 47 (1st Cir.1991).

For both "El Desorden" and "Otra Cosa," Plaintiffs know they have suffered no harm from Pina and any of his companies being allocated percentages.

The APA Schedule bearing Ayala's initials, for "El Desorden" is as follows:

| EL DESORDEN | 893699781 | T9232127445 | AYALA, RAMON L | C | Y | 12.50% |
|---|---|---|---|---|---|---|
| | | | CANGRIS PUBLISHING | E | Y | 12.50% |
| | | | CHEN GROUP PUBLISHING | E | N | 10.00% |
| | | | MALDY PUBLISHING | E | N | 10.00% |
| | | | MUSIC GOOD VIBES PUBLISHING | E | N | 3.00% |
| | | | OZUNA ROSADO, JAN CARLOS | A | N | 7.00% |
| | | | OZUNA WORLDWIDE | E | N | 7.00% |
| | | | PUBLISHER UNKNOWN | E | N | 7.50% |
| | | | SAAVEDRA, VICENTE | CA | N | 3.00% |
| | | | SONGS OF KOBALT MUSIC PUBLISHING | AM | N | 0.00% |
| | | | UNKNOWN, WRITER | CA | N | 7.50% |
| | | | VALLE, ORLANDO JAVIER | A | N | 10.00% |
| | | | VAZQUEZ VEGA, EDWIN F | A | N | 10.00% |

(Admissible as document referenced in the Amended Complaint.) In it, Plaintiffs are allocated a combined 25% share in the work. A host of other persons and publishers, including "publisher unknown" and "writer, unknown" are allocated the remaining 75%.

The purported "hidden email" that "reveals" that Pina-Nieves improperly secured a share in "El Desorden" is identified on ¶73 of the Amended Complaint:

29

On or about August 2, 2018, at approximately 11:51 a.m., Pina-Nieves, using his WML email address, knowingly and intentionally transmitted… and email… in which he falsely represented that he held an eleven-point sixty-eight percent (11.68%) publishing share in the musical composition "El Desorden." The email falsely created the appearance that Ayala-Rodríguez had approved the allocation of the 11.68% publishing share in the musical composition "El Desorden."

Dkt. 48, ¶73.

That email reads as follows:

> **From:** **Raphy Pina** RAPHYPINA@pinarecords.net
> **Subject:** Re: Song Confirmation: "El Desorden" Daddy Yankee, Plan B & Ozuna
> **Date:** August 2, 2018 at 11:52 AM
> **To:** Yendi.Rodriguez@sonyatv.com
> **Cc:** andrescoll@pinarecords.net
>
> Fácil
>
> 40 ozu
> 25 dy
> 11.66 Chen
> 11.68 pina
> 11.66 Maldy
> ———-
>
> Si los magníficos
>
> *Rafael A. Pina Nieves*
> @Pinarecords1
> (787)743-1100
>  Sent from my iPhone

(Admissible as document referenced in the Amended Complaint.)

As per the allegations of ¶73 of the Amended Complaint, what we see in the email from Pina is a list of publishing shares for "El Desorden". The emails states that "dy" has a 25% share in the work. The Court need not conduct a hearing to conclude that in this context "dy" stands for "Daddy Yankee," Ayala's artistic name.

As can be gathered, Ayala/Lon Cangris' share in the APA Schedule and the share in the email are exactly the same: 25%.

The same occurs with Otra Cosa. The APA Schedule, for Otra Cosa is as follows:

30

| | | | Party | Role | Y/N | % |
|---|---|---|---|---|---|---|
| OTRA COSA | 891879470 | T9217577010 | AYALA, RAMON L | CA | Y | 12.50% |
| | | | CANGRIS PUBLISHING | E | Y | 12.50% |
| | | | A MILLION DOLLAR DREAM | E | N | 3.75% |
| | | | JHAY CORTEZ | CA | N | 7.50% |
| | | | LOS MAGNIFIKOS MUSIC | E | N | 12.50% |
| | | | MUSIC BY DREAMSOUND ENTERTAINMENT | E | N | 10.00% |
| | | | NATASHA, NATTI | CA | N | 10.00% |
| | | | PINA, NIEVES RAFAEL A | CA | N | 12.50% |
| | | | ROSA CINTRON, EGBERT ENRIQUE | CA | N | 7.50% |
| | | | SONGS OF KOBALT MUSIC PUBLISHING | AM | N | 0.00% |
| | | | SONY ATV LATIN MUSIC PUBLISHING LLC | E | N | 7.50% |
| | | | SONY/ATV DISCOS MUSIC PUBLISHING LLC | AM | N | 0.00% |
| | | | WC MUSIC CORP | AM | N | 0.00% |
| | | | | E | N | 3.75% |
| | 894833665 | (blank) | AYALA, RAMON L | CA | Y | 12.50% |
| | | | CANGRIS PUBLISHING | E | Y | 12.50% |
| | | | A MILLION DOLLAR DREAM | E | N | 3.75% |
| | | | GUTIERREZ, NATALIA ALEXANDRA | CA | N | 10.00% |
| | | | NIEVES, JESUS MANUEL | CA | N | 7.50% |
| | | | PINA, NIEVES RAFAEL A | CA | N | 12.50% |
| | | | ROSA CINTRON, EGBERT | CA | N | 7.50% |
| | | | UNKNOWN PUBLISHER | E | N | 30.00% |
| | | | WC MUSIC CORP | AM | N | 0.00% |
| | | | | E | N | 3.75% |
| | 896360497 | (blank) | AYALA, RAMON L | CA | Y | 12.50% |
| | | | CANGRIS PUBLISHING | E | Y | 12.50% |
| | | | CINTRON, EGBERT | CA | N | 7.50% |
| | | | DREAMSOUND CORP | SE | N | 0.00% |
| | | | GUTIERREZ, NATALIA ALEXANDRA | CA | N | 10.00% |
| | | | KOBALT SONGS MUSIC PUBLISHING | SE | N | 0.00% |
| | | | LA DURA DE LAS DURAS PUBLISHING | E | N | 10.00% |
| | | | NIEVES, JESUS MANUEL | CA | N | 7.50% |
| | | | PINA, NIEVES RAFAEL A | CA | N | 12.50% |
| | | | UNKNOWN PUBLISHER | E | N | 27.50% |

(Admissible as document referenced in the Amended Complaint.) For each of the associated products, Plaintiffs Ayala and Cangris Publishing are recognized a combined 25% interest.

The purported "hidden email" that "reveals" that Pina-Nieves improperly secured a share in "Otra Cosa" is identified on ¶71 of the Amended Complaint :

> On or about January 11, 2017, at approximately 4:01 p.m., Coll-Fernández, using his WML email account, knowingly and intentionally sent an email" were he "falsely represented that Pina-Nieves and his publishing company, Mafer, held a thirty percent (30%) publishing share in the musical composition "Otra Cosa," which exceeded Plaintiffs' twenty-five percent (25%) share. The email falsely created the appearance that Ayala-Rodríguez had approved the allocation of the 25% publishing share in the musical composition "Otra Cosa."

Dkt. 48, ¶71.

This is the referenced email:

31



Begin forwarded message:

**From:** Andres Coll <andrescoll@pinarecords.net>
**Subject: splits Otra Cosa**
**Date: January 11, 2017 at 4:01:23 PM AST**
**To:** rrivera@ascap.com

Egbert E. Rosa "Haze" / Sony/ATV Latin Music Publishing LLC (BMI) / 15%

Rafael Pina / Mafer Music Publishing (ASCAP) Administered by Sony/ATV Latin Music Publishing LLC 30%

Ramón L. Ayala "Daddy Yankee" / Los Cangris Publishing (ASCAP) / 25%

Natalia Gutiérrez "Natti" / adm by Mafer Music Publishing (ASCAP)/ 15%

Jesús M. Nieves Cortés / A Million Dollar Dream (ASCAP) /15%

(Admissible as document referenced in the Amended Complaint.)

As can be gathered, Ayala/Lon Cangris' share in the APA Schedule initialized by Ayala and the share in the email are exactly the same: 25%.

In both instances, "El Desorden" and "Otra Cosa," the Amended Complaint fails to establish a cognizable injury to "business or property" as required under RICO. By Plaintiffs' own pleading, the emails purportedly sent by Pina and Coll-Fernández maintain that Ayala-Rodríguez held a 25% share in both works, the same percentage identified in the APA Schedule. Critically, there are no allegations that Plaintiffs' own ownership interests were reduced, reassigned, or otherwise diminished as a result of this communication. The emails do not purport to alter Plaintiffs' share, nor does it contradict the executed song schedule identifying Ayala-Rodríguez's 25% interest. As such, even accepting the allegation as true, the purported misrepresentations concern only the allocation of another party's share and does not, on its face, impair Plaintiffs' property rights.

As to "No Lo Trates," Plaintiffs allege that Pina fraudulently executed, on behalf of El Cartel, a letter agreement assigning himself a 3% publishing interest in the composition, whereas Ayala had previously executed a version of the agreement that did not allocate any publishing share to Pina. Dkt. 48, ¶¶ 77–79. The two documents are otherwise identical, differing only in the table listing the composition's authors and their respective percentages. Even accepting these allegations as true, the Amended Complaint fails to plausibly plead a cognizable economic injury arising from the alleged 3% allocation.

Plaintiffs' own exhibits undermine any inference that Pina's purported share was taken from Ayala. Exhibit 2 reflects an earlier allocation among three authors—Pitbull (40%), Ramón Luis Ayala (30%), and Natalia Alexandra Gutiérrez Batista (30%). By contrast, Exhibit 1 reflects a materially different authorship structure involving multiple additional co-writers and a comprehensive redistribution of percentages, under which Ayala is attributed 8%, Gutiérrez Batista 4%, and Pina 3%, alongside numerous other contributors. This is not a scenario in which a discrete 3% interest is carved out of Ayala's share; rather, it reflects a broader reconfiguration of authorship across a larger group of writers.

Critically, Plaintiffs do not allege facts tracing Pina's purported 3% share to any diminution of Ayala's interest, as opposed to redistribution among other co-writers or the inclusion of additional contributors. The pleadings offer no factual basis to conclude that Ayala's percentage was reduced by virtue of Pina's inclusion, rather than as part of a broader reallocation reflecting additional authorship claims. In light of these obvious

33

alternative explanations, Plaintiffs' theory that Pina's 3% was taken from Ayala is entirely speculative and fails to meet the plausibility standard required under Rule 8.

This deficiency is fatal to both injury and proximate cause under RICO. Civil RICO requires a concrete injury to business or property that is directly caused by the alleged predicate acts. Absent allegations identifying whose share was reduced—and specifically that Plaintiffs' share was diminished—there is no plausible basis to conclude that Defendants' conduct caused any economic loss to Plaintiffs at all. At most, the Amended Complaint alleges the existence of differing allocation documents, not that Plaintiffs lost any identifiable percentage or income as a result. Because Plaintiffs fail to plead a non-speculative diminution of their property interest or a direct causal link between the challenged conduct and any financial harm, their RICO claim fails as a matter of law.

The "No Lo Trates" allegation also fails to plead a viable predicate act of wire fraud. The purported misrepresentation arises from a disputed letter agreement allegedly executed without authority. But Plaintiffs do not identify any false statement made in the January 29, 2020, email itself, nor do they allege with particularity how the transmission furthered a scheme to defraud, as opposed to merely circulating a preexisting document. Critically, whether the agreement was "unauthorized" depends entirely on an underlying ownership and authority dispute, not an objectively false statement of fact. Such allegations do not constitute wire fraud as a matter of law. That is a contract or ownership dispute— not fraud—and cannot be transformed into a RICO predicate by the mere act of transmitting the document electronically.

### (v)    Plaintiffs' "Sale of Sound Recordings" theory allegation fails to plead wire fraud with particularity

The allegation concerning the purported December 1, 2018 "sale" to Intercontinental fails to state a predicate act of wire fraud under 18 U.S.C. § 1343 and does not satisfy Rule 9(b).

First, Plaintiffs do not plead the alleged misrepresentation with the required particularity. Rule 9(b) requires the "who, what, when, where, and how" of the alleged fraud. See *Rodi v. S. New England Sch. of Law*, 389 F.3d 5, 15 (1st Cir. 2004). Here, Plaintiffs do not identify any specific communication, the contents of any allegedly false statement, who made it, to whom it was directed, or when it was transmitted. Instead, they assert only that unspecified "documents" relating to the transaction "travelled through wire communications" and "contained false information." Such conclusory allegations fall well short of Rule 9(b)'s heightened pleading standard and are insufficient to state a predicate act of wire fraud.

Second, Plaintiffs fail to allege a cognizable scheme to defraud. The theory rests entirely on the assertion that Defendants lacked authority to transfer the works because there was no "valid written instrument of conveyance." But whether Defendants possessed rights in the compositions or masters is a question of underlying copyright ownership—not fraud, an issue governed by 17 U.S.C. § 204 and well-established principles of copyright law. The Complaint does not identify any false statement of fact, as opposed to a disputed legal position regarding ownership interests. A disagreement over contractual or ownership rights does not, without more, constitute a fraudulent scheme.

35

Third, Plaintiffs do not plausibly allege reliance or causation. They assert in conclusory terms that the U.S. Copyright Office and "industry stakeholders" relied on the unspecified documents, but do not identify any representation that was relied upon, nor how such reliance caused a concrete loss. The Copyright Office does not adjudicate ownership disputes, and Plaintiffs do not allege facts showing that any purported misstatement—as opposed to independent verification and administration by third parties—proximately caused their alleged injury.

Fourth, the allegation improperly relies on foreseeability of interstate wires rather than actual use in furtherance of a fraudulent scheme. Plaintiffs merely allege that it was "foreseeable" that documents would travel through interstate wires. But § 1343 requires the use of wires for the purpose of executing a scheme to defraud—not the incidental or foreseeable transmission of documents in the ordinary course of a business transaction.

Finally, the allegation is entirely derivative of Plaintiffs' unpleaded and disputed ownership claims. To establish falsity, Plaintiffs must first show that Defendants had no ownership interest to convey—a question they fail to plausibly allege elsewhere. Because the supposed "fraud" depends on resolving an underlying ownership dispute, the allegation does not constitute an independent predicate act under RICO.

For all of these reasons, the December 1, 2018 transaction does not plausibly allege wire fraud and cannot serve as a RICO predicate.

### (vi)    Plaintiffs' "Sale of Sound Recordings" Theory Fails Because It Is Unrelated, Not a Predicate Act, and Deficiently Pleaded.

Plaintiffs allege that: "in 2018, Pina-Nieves, Mafer, Los Magnifikos, and WML sold to Intercontinental sound recordings (masters) and musical compositions belonging to Plaintiffs." Amended Complaint, ¶42.

36

The Supreme Court held in *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989), that RICO's pattern requirement ensures that a person is not "subjected to sanctions for committing two widely separated and isolated criminal offenses." "Related" conduct "embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id*. at 240.

The Ninth Circuit applied this framework in *Howard v. America Online Inc.*, 208 F.3d 741, 749–50 (9th Cir. 2000), holding that predicate acts sharing the same participants but differing in "purpose, result, victim and method" are not "related" within the meaning of RICO. The court held that "[t]o hold that Plaintiffs have established relatedness solely because they implicate the same participants makes that requirement virtually meaningless." *Id*. at 750.

The main thrust of the Complaint is the alleged use of interstate communications to manipulate publishing splits and falsely attribute authorship shares in musical compositions. Those allegations concern publishing rights, royalty allocations, and industry filings directed at performance rights organizations and publishers. By contrast, the alleged 2018 transaction involving the sale of sound recordings concerns master rights, asset transfers, and a discrete commercial sale to a third party—Intercontinental. The two sets of allegations differ in purpose (allocation of publishing income versus transfer of ownership of masters), result (ongoing royalty diversion versus a one-time asset sale), victim (co-authors and publishers versus a contracting counterparty), and method (email communications and registry filings versus a negotiated commercial transaction).

Under *H.J. Inc.*, such differences are dispositive. Predicate acts must share common characteristics that render them part of a single scheme; otherwise, they are merely "widely separated and isolated criminal offenses." 492 U.S. at 239–40. The alleged sale of masters is not part of the purported "split sheet" scheme—it is a separate transaction involving different rights, different mechanics, and different market actors. As in *Howard*, the mere fact that some of the same individuals are involved is insufficient to establish relatedness where the acts otherwise diverge in their essential characteristics. 208 F.3d at 750.

### 6. Plaintiffs Lack RICO Standing Because the Damages Are Not Clear and Definite

This Court held in *Boyd* that RICO standing requires a threshold showing that a plaintiff "(1) suffered an injury to their business or property, and (2) that the defendant's violation of Section 1962 both proximately caused and was the but-for cause of that injury." *Boyd*, Op. at 20 (citing *Lerner v. Colman*, 26 F.4th 71, 77 (1st Cir. 2022); *Sterling Suffolk Racecourse, LLC v. Wynn Resorts, Ltd.*, 990 F.3d 31, 35 (1st Cir. 2021)). Injuries "cannot be hypothetical or based on mere speculation." *Boyd*, Op. at 20 (citing *DeMauro v. DeMauro*, 115 F.3d 94, 97 (1st Cir. 1997)). "[A]s a general rule, a cause of action does not accrue under RICO until the amount of damages becomes clear and definite." *Id.* (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994)).

Chief Judge Arias-Marxuach applied the same standard in this District in *PR Soccer League*, at 15, dismissing RICO claims where plaintiff alleged "lost earnings of at least $1,500.00 each year" because "without knowing which [opportunities] were lost, or when, it would be impossible to calculate damages." *Id.*

In the original Complaint, Plainitffs claimed $3,000,000 without providing any explanation of a methodology to arrive at that figure. Plaintiffs' amendment makes matters

38

worse. The treble-damages floor was raised from \$3,000,000 (Dkt. No. 1 at 105) to \$4,000,000 (Dkt. No. 48 at 101), a 33% increase accompanied by zero additional methodology. A new \$450,000 copyright misappropriation claim was added (Dkt. No. 48, ¶ 156). Neither figure is supported by a per-song royalty accounting, a time-period breakdown, or any calculation tying specific predicate acts to specific losses.

Plaintiffs' core theory is that Pina allegedly attributed to himself a percentage of authorship to which he was not entitled. Even taking that allegation as true, it does not establish a cognizable RICO injury because Plaintiffs fail to plead on a per work basis how such attribution diminished Ramón Ayala's ownership interest or income. As has been argued above, the Amended Complaint itself and the documents it references shows that with respect to some of the works, authorship shares were allocated among multiple writers and stakeholders, and the inclusion of a % share attributed to Pina did not reduce Ayala's fixed percentage. Plaintiffs thus cannot equate what Pina allegedly obtained with what Ayala purportedly lost, but RICO requires the latter—not the former. As this Court held in *Boyd*, a plaintiff must plausibly allege both a concrete injury to business or property and that the alleged RICO violation was the but-for and proximate cause of that injury. *Boyd*, Op. at 20. Where, as here, Plaintiffs do not (and cannot) allege that Pina's purported share displaced or diluted Ayala's own contractual percentage, any claimed injury is necessarily speculative. This defect is compounded by Plaintiffs' failure to offer any non-speculative methodology tying specific authorship allocations to actual lost royalties. Instead, they present inflated, round-number damages figures untethered to any per-song accounting or causal analysis. Because Plaintiffs have not plausibly alleged that Pina's alleged gain

corresponded to a loss by Ayala, they fail to plead the requisite injury and causation under § 1964(c), and their RICO claim fails as a matter of law.

This Court's language in *Boyd* applies with full force: "it is hard to see how a court would calculate damages now, given the dual uncertainties." *Boyd*, Op. at 29 (quoting *DeMauro*, 115 F.3d at 97). Without knowing which songs generated which losses, over what periods, calculated by what method, Plaintiffs' damages claim is precisely the kind of speculative allegation that *First Nationwide Bank*, *DeMauro*, *PR Soccer League*, and now *Boyd* hold insufficient for RICO standing.

### 7.  Plaintiffs Fail to Establish a Pattern

Even assuming Plaintiffs have adequately pled predicate acts (which they have not), those acts do not establish the "pattern" RICO requires. A "pattern" demands relationship plus continuity. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989). The First Circuit has "consistently declined to find continuity where the RICO claim concerns a single, narrow scheme targeting few victims." *Home Orthopedics Corp. v. Rodríguez*, 781 F.3d 521, 530 (1st Cir. 2015).

In *Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12 (1st Cir. 2000), the First Circuit dismissed RICO claims observing that: "In sum, while the complaint pleads a series of related racketeering acts and permits an inference that defendants defrauded appellant and two of his partners, we agree with the district court's determination that no reasonable jury could find that these allegations establish a RICO "pattern." Taken together, the acts as alleged comprise a single effort, over a finite period of time, to wrest control of a particular partnership from a limited number of its partners. This cannot be a RICO violation*." Id.,* at  21.

Here, Plaintiffs allege what is, at bottom, a single scheme: obtaining publishing percentages in songs involving Ayala-Rodríguez. The scheme had a finite, terminable goal and targeted essentially one victim. There is no indication it would continue into the indefinite future—the business relationship between Plaintiffs and Pina-Nieves has ended. Plaintiffs attempt to inflate the pattern by listing dozens of predicate acts, but these are all part of the same scheme directed at the same victim. Multiplying the number of emails does not create continuity. *See Efron*, 223 F.3d at 20.

### 8.    The Complaint Fails Because No Scienter is Alleged

Plaintiffs fail to plead scienter with particularity as required by Rule 9(b). The Amended Complaint relies on conclusory assertions that Defendants acted "knowingly" or "intentionally," but alleges no specific facts showing contemporaneous knowledge of falsity or intent to deceive. Wire fraud requires proof of intent to defraud. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007) (plaintiffs must allege facts giving rise to a "strong inference" of fraudulent intent). In the music industry, producers, managers, and executive producers routinely receive publishing percentages as compensation for creative and business contributions. If Pina-Nieves reasonably believed his allocations were consistent with industry practice—and approved by the corporate president—he lacked fraudulent intent as a matter of law.

Under *Tellabs*, where an obvious, non-fraudulent explanation exists, Plaintiffs cannot establish a strong inference of fraudulent intent. Because Plaintiffs plead no particularized facts supporting scienter—and offer only labels and hindsight disagreement over ownership—the wire fraud predicates fail as a matter of law.

### B.  The Complaint is Time Barred

A statute-of-limitations defense may be resolved on a Rule 12(b)(6) motion "when the pleader's allegations leave no doubt that an asserted claim is time-barred." *LaChapelle v. Berkshire Life Ins. Co.*, 142 F.3d 507, 509 (1st Cir. 1998).

1.  **Plaintiffs' RICO Claims Are Time-Barred Because They Impermissibly Recast a Copyright Ownership Dispute Subject to the Copyright Act's Three-Year Limitations Period**

Plaintiffs' RICO theory fails because it is, at bottom, a copyright ownership dispute subject to the Copyright Act's three-year statute of limitations, which cannot be extended through artful pleading of RICO wire fraud. Where, as here, a plaintiff challenges the allocation of publishing shares or the attribution of authorship, the Court would be required to determine ownership rights by reference to the Copyright Act. See *Santa-Rosa v. Combo Records*, 471 F.3d 224, 227 (1st Cir. 2006). Under 17 U.S.C. § 507(b), claims concerning authorship, ownership, and entitlement to copyright interests must be brought within three years of accrual.

An ownership claim accrues when "a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right." *Stone v. Williams*, 970 F.2d 1043, 1048 (2d Cir.1992). See *Merchant v. Levy*, 92 F.3d 51, 56 (2d Cir. 1996); *Zuill v. Shanahan*, 80 F.3d 1366, 1369–70 (9th Cir. 1996). Once such ownership claim is deemed to be known, the ownership claim is time-barred after three years and cannot be revived indirectly.

Civil actions under the Copyright Act must be brought 'within three years after the claim has accrued. *Kwan v. Schlein*, 634 F.3d 224, 228 (2d Cir. 2011) (quoting 17 U.S.C. § 506(b)). An ownership claim accrues only once, when "a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right." *Id.*

42

Plaintiffs' allegations—that Pina-Nieves "inserted his name as an author" and "assigned himself publishing shares"—are paradigmatic copyright authorship and ownership claims. Here, Plaintiffs allege that Defendants falsely claimed authorship and publishing shares through emails and embedded those claims in industry records. But those allegations merely describe the mechanism by which Defendants asserted ownership—not a distinct injury. The injury itself—the alleged loss or dilution of Plaintiffs' ownership interests—arose when Plaintiffs knew or should have known that Defendants claimed those rights. At that point, any copyright ownership claim accrued and was subject to the Copyright Act's three-year limitations period.

That principle is dispositive here. In the original Complaint, Ayala argued that Pina had fraudulently and without his knowledge, allocated authorship shares to himself in, among others, the following works: Buena Vida, Buena Vida (Remake), Dura (Remix), Bella y Sensual, Inolvidable (Remix), La Rompe Corazones, Llevo Tras De Ti, Mayor Que Yo 3, Otra Cosa, Perdido por el Mundo, Todo Comienza en la Disco, Vuelve, and Zum Zum Zum. It was pointed out in one of the motions to dismiss, that Ayala had signed a Binding Term Sheet Agreement in 2019 that included those works in a Schedule, and that the Schedule showed Pina's allocations. Thus, that he knew of Pina's allegedly fraudulent practice since then.

In the Amended Complaint, Ayala concedes that he executed and initialed the Binding Term Sheet Agreement in 2019 that "included specific publishing share allocations for several compositions authored by Ayala-Rodríguez—of which only four correspond to the works implicated in the allegations set forth in this Amended Complaint." Dkt. No. 48 ¶ 54. Plaintiffs may have removed nine works from the Amended Complaint

43

because the 2019 Binding Term Sheet Agreement proves that any claim based on them is time barred, but that does not make the notice and reasonable diligence problem disappear.

The Binding Term Sheet Agreement establishes that by 2019 at the latest, Ayala-Rodríguez had actual knowledge of publishing splits allocating interests to Pina-Nieves (and/or his entities) in numerous works he has alleged were fraudulently concealed. Those constitute classic "storm warnings"—facts sufficient to alert a reasonable person to the possibility of wrongdoing and to trigger a duty to investigate. Having been placed on notice of those allocations, Plaintiff cannot plausibly claim that the same publishing splits remained concealed.

Plaintiff's pleading strategy—omitting those compositions from the Amended Complaint—does not cure the defect. A plaintiff cannot avoid the consequences of inquiry notice by narrowing his claims after the fact. The omitted works remain highly probative of when Plaintiff was on notice and whether he exercised reasonable diligence.

Second, Plaintiff's own allegations independently establish inquiry notice. In paragraph 28 of the Amended Complaint, Ayala pleads that publishing shares in his compositions could not be assigned without his express authorization, that his signature was required, and that such authorization "was in fact sought and obtained"—except in the instances he now challenges. In other words, Plaintiff alleges a uniform, consistent course of dealing in which his approval was a condition precedent to any allocation of publishing interests.

That allegation is fatal to his concealment theory.

Where parties operate under a consistent transactional protocol, any material deviation from that protocol is inherently conspicuous. If, as alleged, Ayala-Rodríguez

44

routinely reviewed and executed approvals for publishing splits, then the absence of any request for his authorization in connection with commercially released, exploited, or monetized works would have constituted an obvious and immediate red flag. The omission of a required signature in a system where such approval is allegedly universal is not latent—it is affirmatively noticeable to the very party whose authorization is purportedly indispensable.

Put differently, Plaintiff cannot simultaneously maintain that (1) his authorization was always required and consistently obtained, and (2) he remained unaware that certain works were being exploited without it. Those propositions are irreconcilable. The first establishes a baseline expectation; the second requires ignoring a systematic deviation from that baseline.

At a minimum, the alleged deviation imposed a duty of reasonable diligence. A reasonable rights holder operating under such a protocol would have inquired into the status of any work released or exploited without his approval. Plaintiff's failure to do so— particularly in the face of the additional documentary "storm warnings" reflected in the 2019 Binding Term Sheet—triggers the well-established doctrine of inquiry notice.

Accordingly, because Plaintiffs' claims are fundamentally claims of copyright ownership and authorship, and because those claims accrued more than three years before suit was filed, they are time-barred under 17 U.S.C. § 507(b). Plaintiffs cannot revive them by recharacterizing the same alleged conduct as wire fraud or a RICO violation. The RICO claims should therefore be dismissed on this independent ground.

45

The Amended Complaint claims the "enterprise" allocated shares to Pina for various works from 2017 ("Otra Cosa") to July 2022 ("Mayor que Usted"). The Complaint was filed in November 2025, beyond the three-year statute of limitations.

### 2. RICO's Four-Year Limitations Period Bars All But a Handful of Recent Allegations

Civil RICO carries a four-year statute of limitations. *Agency Holding Corp. v. Malley-Duff & Assocs.*, 483 U.S. 143, 156 (1987). Accrual begins when the injury is discovered or should have been discovered with reasonable diligence; discovery of the entire pattern is not required. *Rotella v. Wood*, 528 U.S. 549, 553–55 (2000); *Álvarez-Maurás v. Banco Popular of P.R.*, 919 F.3d 617, 625–26 (1st Cir. 2019).

In the First Circuit, accrual is injury-based, not discovery-of-scheme based. The limitations period begins when the plaintiff discovers—or in the exercise of reasonable diligence should have discovered—the injury itself. See *Lares Grp., II v. Tobin*, 221 F.3d 41, 44 (1st Cir. 2000). There is no "last predicate act" rule that would revive earlier time-barred injuries. *Id.,* at 44–45.

Reasonable diligence does matter, and a plaintiff who is not reasonably diligent may not assert "fraudulent concealment." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194, 117 S. Ct. 1984, 1993, 138 L. Ed. 2d 373 (1997). Fraudulent concealment in the context of civil RICO embodies a "due diligence" requirement. Id. at. 196. Thus, a plaintiff who fails to exercise reasonable diligence cannot invoke concealment to toll the statute.

*Klehr* requires diligence. The First Circuit has repeatedly held that accrual begins when a plaintiff has sufficient information that would prompt a reasonably diligent person to investigate. See *Álvarez-Maurás*, 919 F.3d at 626. Thus, even if Plaintiffs were to argue

46

that not all compositions are included in the assignment, it indisputably placed him on inquiry notice going forward.

As stated in the previous subsection, Plaintiffs became aware that Defendants were claiming authorship shares in the claimed works since Ayala signed a Binding Term Sheet in 2019, that put him on inquiry duty. In addition, the fact that he pleads the established practice was that all splits had to be signed by him, should have put him on inquiry notice every time a work was published without him having signed a split sheet for that work.

If the Court were to apply the RICO four-year statute of limitations, all alleged predicate acts predating November 2021 would be time barred. That means that only "Te Felicito (December 2021), "Zona del Perreo" (February 2022) and "Mayor que usted" (July 2022) would escape the statute of limitations.

## C.    The § 1962(d) Conspiracy Claim Fails

A RICO conspiracy claim under § 1962(d) cannot survive absent a viable substantive RICO claim. *Efron*, 223 F.3d at 21; *Home Orthopedics*, 781 F.3d at 530. Because Plaintiffs fail to plead predicate acts, a cognizable enterprise, continuity, proximate cause, and timeliness, the conspiracy claim necessarily fails. Independently, the Complaint's references to "conspiracy" are the type of threadbare recitals that *Iqbal* held "do not suffice." 556 U.S. at 678.

## D.    The Court Should Decline Supplemental Jurisdiction

If the Court dismisses the federal RICO claims, no federal question remains. The remaining Causes of action are all state law actions for which Plaintiff invokes the Court's

supplemental jurisdiction under 28 USC § 1367. If the Court dismisses the federal law claims, it should decline supplemental jurisdiction.

As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit, well before the commencement of trial, will trigger the dismissal without prejudice of any supplemental state-law claims. *Rodriguez v. Doral Mortg. Corp.*, 57 F.3d 1168, 1177 (1st Cir. 1995). The First Circuit strongly favors that result where federal claims are dismissed early. *Camelio v. Am. Fed'n*, 137 F.3d 666, 672 (1st Cir. 1998). The First Circuit case law has stated repeatedly, "that district courts may decline to exercise supplemental jurisdiction over pendent state law claims when the anchor federal claims for those state law claims are dismissed." *Borrás-Borrero v. Corporación del Fondo del Seguro del Estado*, 958 F.3d 26, 37 (1st Cir. 2020); see also, *Rivera-Diaz v. Humana Ins. of P.R., Inc.*, 748 F.3d 387, 392 (1st Cir. 2014). After all, the Supreme Court has expressed that: "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726 (1966).

Although in some cases a court may retain jurisdiction over state law claims, that is appropriate only in limited circumstances. As the First Circuit has emphasized*,* "[o]nly in an appropriate situation, a federal court may retain jurisdiction." *Rodríguez.,* 57 F.3d at 1177. The factors a district court should weigh in exercising that discretion include judicial economy, convenience, fairness, and comity. *Id*. Where those factors do not strongly favor retaining jurisdiction, dismissal is proper.

In this case, those discretionary factors weigh in favor of declining jurisdiction. The parties would not suffer undue prejudice from dismissal, and Puerto Rico courts are fully

48

competent to adjudicate the remaining claims. Furthermore, comity strongly favors having Puerto Rico's courts resolve issues arising under local law, including breach of fiduciary duty, contractual disputes, fraud, and defamation.

Accordingly, if the Court dismisses the federal claims, it should also dismiss the remaining causes of action under Puerto Rico law for lack of supplemental jurisdiction.

### E.    Leave to Amend Would Be Futile

Plaintiffs have already amended their extensive Complaint and RICO Case Statement prepared under Rule 11's reasonable-inquiry mandate. Thus, Plaintiffs have now had ample opportunities to articulate a viable RICO claim. The deficiencies identified herein are not factual gaps amendable to cure; they are structural legal deficiencies inherent in Plaintiffs' theory: lack of damages methodology, lack of enterprise distinctness, failure to satisfy Rule 9(b), temporal impossibility, lack of continuity, statute-of-limitations bars, and conspiracy failure. Dismissal should be with prejudice as to the federal claims.

## V. CONCLUSION

Plaintiffs have now had every fair opportunity to plead a viable civil RICO claim. They filed an original Complaint, a Court-ordered RICO Case Statement prepared under Rule 11's reasonable-inquiry standard, an Amended Complaint, and an Amended RICO Case Statement. Yet after four iterations, the same defects remain. The pleadings do not allege a cognizable enterprise distinct from the alleged racketeering activity; do not plead actionable predicate acts with the particularity Rule 9(b) demands; do not plausibly allege scienter, continuity, or a non-speculative injury to business or property; and do not

49

overcome the statute-of-limitations bar apparent from the pleadings and the documents on which Plaintiffs themselves rely.

The amendment does not cure those defects. At most, it repackages the same theory in revised language while leaving intact the core admissions and contradictions that defeat plausibility. As a matter of pleading, the original complaint has disappeared; as an evidentiary admission, it did not. See *Wiseman v. Reposa*, 463 F.2d 226, 227 (1st Cir. 1972). Plaintiffs cannot avoid the consequences of their prior allegations by repleading around them, particularly where the amended allegations remain internally inconsistent and structurally incapable of stating a RICO claim.

What remains is not a plausible federal racketeering case, but a business and copyright dispute recast in RICO terminology. The First Circuit has repeatedly warned against precisely that kind of overreach and has instructed district courts to eliminate deficient RICO claims at the pleading stage. This case is no exception.

Accordingly, the Court should dismiss Plaintiffs' claims under 18 U.S.C. §§ 1962(c) and 1962(d) with prejudice pursuant to Rule 12(b)(6). Because no viable federal claim would remain, the Court should decline to exercise supplemental jurisdiction over the Puerto Rico law claims under 28 U.S.C. § 1367(c)(3) and dismiss them without prejudice. And because Plaintiffs have already pleaded and repleaded their best case under the discipline of a Court-ordered RICO statement, further amendment would be futile.

WHEREFORE, defendants Rafael A. Pina-Nieves, Los Magnifikos Inc., and Mafer Music Publishing Inc. respectfully request that this Honorable Court:

1.      Dismiss with prejudice Plaintiffs' claims under 18 U.S.C. §§ 1962(c) and 1962(d) pursuant to Fed. R. Civ. P. 12(b)(6);

2.      Decline to exercise supplemental jurisdiction over Plaintiffs' remaining Commonwealth-law claims pursuant to 28 U.S.C. § 1367(c)(3), and dismiss those claims without prejudice; and

3.      Grant Appearing Defendants such other, further, and different relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED

In San Juan, Puerto Rico, this 6 April 2026

**Counsel for**
**Mafer Music Publishing Inc.**
**Los Magnifikos, Inc.**
**World Music Latino, Corp.**

**s/ José A. Hernández Mayoral**
José A. Hernández Mayoral
USDC 205307
250 Tetuán, San Juan, PR 00901
Tel. 787 607-4867
Email: jahm@mac.com

**Counsel for**
**Rafael A Pina-Nieves**

**s/ Patricia Rivera MacMurray**
Patricia Rivera MacMurray
USDC 222309
250 Tetuán, San Juan, PR 00901
Tel. 787-607-3700
Email: Prm3@mac.com

I CERTIFY that a copy of this motion is being notified to all counsel of record through the CM/ECF system.

**s/ José A. Hernández Mayoral**

51